

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed August 27, 2024**

_____

**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **IN RE BENHAM ORTHODONTICS &** | § | **Case No. 24-42784-elm11** |
| **ASSOCIATES, P.A,** | § | **Chapter 11** |
| | § | |
| **Debtor,** | § | |
| ------------------------------------------------- | § | ----------------------------------------- |
| **FIVE POINT DENTAL SPECIALISTS, INC.,** | § | |
| **FPDS BENHAM SUB, LLC, and BENHAM** | § | |
| **ORTHODONTICS, P.A.,** | § | |
| | § | |
| **Plaintiffs** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **ADAM BENHAM, DDS, MS, BENHAM** | § | |
| **PROPERTY OWNERS ASSOCIATION,** | § | **Adv. No. 24-04068** |
| **LLC, BENHAM ORTHODONTICS &** | § | |
| **ASSOCIATES, P.A.** | § | |
| | § | |
| **Defendants.** | § | |

### MEMORANDUM OPINION
**[Application for Temporary Restraining Order]**

### *INTRODUCTION*

This adversary proceeding involves a dispute between Five Point Dental Specialists, Inc.

("***Five Point***") and certain of its affiliates, on the one hand, and Adam Benham, DDS, MS

("**Benham**") and certain of his affiliates, on the other hand, arising out of the sale of Benham's

orthodontic practice (the "**Practice**") to Five Point in 2020.

Prior to the August 7, 2024 (the "**Petition Date**"), the Five Point Parties[1] and Benham

Parties[2] were engaged in litigation in Texas state court under Cause No. 471-02575-2024 (the

"**State Court Case**") in the 471st Judicial District Court of Collin County, Texas (the "**State**

**Court**"). On the Petition Date, the Benham Debtor, a Texas professional association organized by

Benham on or about April 24, 2024:[3] (a) filed a petition for voluntary relief under chapter 11 of

the United States Bankruptcy Code, thereby initiating Case No. 24-42784 with this Court (the

"**Bankruptcy Case**");[4] and (b) filed a Notice of Removal with the United States District Court for

the Eastern District of Texas (the "**EDTX District Court**") to remove all of the claims in the State

Court Case to the EDTX District Court, thereby initiating Civil Action No. 4:24-CV-00705 with

the EDTX District Court (the "**EDTX Case**").[5] On August 13, 2024, the Benham Debtor then filed

an unopposed motion to transfer the EDTX Case to this Court.[6]

Notwithstanding the issuance of certain pretrial injunctive relief in favor of the Five Point

Parties in the State Court Case, the removal of all claims from the State Court Case to the EDTX

District Court, and the impending transfer of the EDTX Case to this Court, on August 15, 2024,

the Five Point Parties (the Plaintiffs herein) initiated the above-captioned adversary proceeding

with the filing of their *Original Complaint and Emergency Application for Temporary Restraining*

---

[1] The "**Five Point Parties**" are Five Point, FPDS Benham Sub, LLC ("**Benham SubCo**"), and Benham Orthodontics, P.A. ("**Benham Ortho**"). The Five Point Parties are the Plaintiffs in this adversary proceeding and, thus, are also sometimes collectively referred to as the "**Plaintiffs**" herein.

[2] The "**Benham Parties**" are Benham, Benham Property Owners Association, LLC ("**BPOA**"), and Benham Orthodontics & Associates, P.A. (the "**Benham Debtor**"). The Benham Parties are the Defendants in this adversary proceeding and, thus, are also sometimes collectively referred to as the "**Defendants**" herein.

[3] *See* Plaintiffs' Exh. 2G (Certificate of Formation for the Benham Debtor).

[4] *See* Bankruptcy Case, Docket No. 1.

[5] *See* EDTX Case, Docket No. 1.

[6] *See* EDTX Case, Docket No. 5.

*Order, Preliminary Injunction and Permanent Injunction* [Docket No. 1] (the "**Complaint**")

against the Benham Parties (the Defendants herein).  Shortly thereafter, on August 20, 2024, the

EDTX District Court entered an order transferring the EDTX Case to this Court.[7]  As of the date

and time of the entry of this Memorandum Opinion, a new adversary proceeding has yet to be

opened in this Court to receive the transferred EDTX Case.  However, once the transferred EDTX

Case is docketed with this Court as a new adversary proceeding, the Court intends to consolidate

the new adversary proceeding with the above-captioned adversary proceeding for all purposes.

In the meantime, pursuant to the Complaint, the Plaintiffs have asserted the following

claims against the Defendants:

Count 1 – Trespass (against all of the Defendants)
Count 2 – Assault[8] (against all of the Defendants)
Count 3 – Breach of the APA (against Benham)
Count 4 – Breach of the Employment Agreement (against Benham)
Count 5 – Tortious Interference with Existing and Prospective Contracts and Business Relationships (against Benham and the Benham Debtor)
Count 6 – Tortious Interference with Existing Contracts (against the Benham Debtor and BPOA)
Count 7 – Violation of Delaware Uniform Trade Secrets Act (against Benham and the Benham Debtor)
Count 8 – Constructive Trust & Accounting (against all of the Defendants)
Count 9 – Conversion (against Benham and the Benham Debtor)
Count 10 – Objection to Discharge 11 U.S.C. § 523(a)(6) (against the Benham Debtor)

The Plaintiffs have also included a request for the entry of a temporary restraining order (the "***TRO***

***Application***")[9] and a request for issuance of a preliminary and permanent injunction against all of

the Defendants.

---

[7] *See* EDTX Case, Docket No. 6.

[8] Described in the Complaint as "Threats of Bodily Assault or Injury".

[9] *See* Complaint ¶¶ 144-152.

On August 16, 2024, the Plaintiffs filed a motion for an expedited hearing on the TRO Application, which the Court granted, setting a hearing for August 20, 2024, at 1:30 p.m. (CT). Notice of the hearing was provided by Plaintiffs to each of the Defendants on August 19, 2024.

On August 20, 2024, the Court commenced the evidentiary TRO hearing. Each of the Plaintiffs and Defendants appeared by and through counsel, and one or more witnesses were called for each of the parties. Because the hearing did not conclude by the end of the day on August 20, 2024, the Court continued the evidentiary hearing to August 21, 2024, at 1:30 p.m. (CT). Once again, because the hearing did not conclude by the end of the day on August 21, 2024, the Court continued the hearing to August 22, 2024, at 9:30 a.m. (CT). On August 22, 2024, the Court resumed and concluded the hearing.

Having now reviewed the Complaint, including the TRO Application, reviewed the responses to the TRO Application filed by Benham and the Benham Debtor,[10] reviewed the entirety of the record in this adversary proceeding and the EDTX Case, and considered the evidence presented and the representations and arguments of counsel, the Court issues the following findings and conclusions, determining that the TRO Application should be granted in part, and denied in part, as detailed below:[11]

---

[10] *See* Docket Nos. 8 and 15.

[11] To the extent any of the following findings of fact are more appropriately categorized as conclusions of law or include any conclusions of law, they should be deemed as such, and to the extent that any of the following conclusions of law are more appropriately categorized as findings of fact or include findings of fact, they should be deemed as such. Additionally, the Court makes the following factual findings based upon the evidentiary record established at the TRO hearing. Given the expedited nature of the proceeding and the limited notice provided, such findings are preliminary only and shall not be conclusively binding upon the parties in connection with any future proceedings, including, without limitation, the temporary injunction hearing and the final trial on the merits.

## *JURISDICTION AND REFERRAL AUTHORITY*

### A.      *Subject Matter Jurisdiction*

Bankruptcy jurisdiction is dictated by 28 U.S.C. § 1334.[12]  "28 U.S.C. § 1334(b) grants jurisdiction to district courts and adjunct bankruptcy courts [pursuant to 28 U.S.C. § 157(a)] to entertain proceedings 'arising under,' 'arising in a case under,' or 'related to' a case under Title 11 of the United States Code…."[13]  The most remote of these alternative bases is "related to" jurisdiction.  Thus, for purposes of determining whether bankruptcy jurisdiction exists with respect to a proceeding involving a particular claim, it is necessary only to determine whether the proceeding involving the claim is at least "related to" the associated bankruptcy case.[14]

The Fifth Circuit has explained that "related to" is a term of art in bankruptcy jurisdiction.[15]  "'Related to' jurisdiction includes any litigation where the outcome could alter, positively or negatively, the debtor's rights, liabilities, options, or freedom of action or could influence the administration of the bankrupt estate."[16]

### B.      *Referral Authority*

Where bankruptcy jurisdiction of a proceeding involving a claim exists, the district court may refer the proceeding to the bankruptcy court for further disposition pursuant to 28 U.S.C. §

---

[12] *See* 28 U.S.C. § 1334 (jurisdictional provisions with respect to bankruptcy cases and proceedings).

[13] *Bass v. Denney (In re Bass)*, 171 F.3d 1016, 1022 (5th Cir. 1999).

[14] *Walker v. Cadle Co. (In re Walker)*, 51 F.3d 562, 569 (5th Cir. 1995); *Wood v. Wood (In re Wood)*, 825 F.2d 90, 93 (5th Cir. 1987).

[15] *Bass*, 171 F.3d at 1022.

[16] *Collins v. Sidharthan (In r KSRP, Ltd.)*, 809 F.3d 263, 266 (5th Cir. 2015) (quoting *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 386 (5th Cir. 2010) (quoting *Edge Petroleum Operating Co. v. GPR Holdings, LLC (In re TXNB Internal Case)*, 483 F.3d 292, 298 (5th Cir*.), cert. denied*, 552 U.S. 1022 (2007))).

157[17].  That said, there is one limitation.  Section 157 provides that the district court must order

that "personal injury tort and wrongful death claims shall be tried in the district court…."[18]

        The United States District Court for the Northern District of Texas (the "**NDTX District

Court**") has entered Miscellaneous Order No. 33 (the "**Order of Reference**") to provide for the

automatic referral to this Court of all bankruptcy cases and all proceedings arising under the

Bankruptcy Code or arising in or related to a bankruptcy case, subject to the personal

injury/wrongful death claim limitation.  In the case of personal injury and wrongful death claims,

the Order of Reference clearly provides that such claims are excluded from the automatic referral.[19]

### C.     *Analysis of Jurisdiction and Referral Authority Over Plaintiffs' Claims*

        While, for efficiency, the Plaintiffs have permissibly initiated this adversary proceeding

directly with this Court instead of with the NDTX District Court, the ability of this Court to

exercise jurisdiction with respect to each particular claim asserted pursuant to the Complaint is

dependent upon both the existence of bankruptcy jurisdiction under 28 U.S.C. § 1334 and referral

authority pursuant to the Order of Reference.

        With the foregoing in mind, the Court makes the following jurisdictional determinations

with respect to the claims asserted by the Plaintiffs pursuant to the Complaint:

    *Claims Against the Benham Debtor*.  The easiest analysis relates to those claims that the
Plaintiffs have asserted against the Benham Debtor.  Not only are those claims "related to" the
Bankruptcy Case, inasmuch as the outcome will necessarily alter, positively or negatively, the
Benham Debtor's rights, liabilities, options, or freedom of action and will influence the
administration of the Benham Debtor's bankrupt estate, they are core in nature as provided in 28
U.S.C. § 157(b)(2)(B).  Therefore, bankruptcy jurisdiction exists with respect to each of the claims
asserted against the Benham Debtor.

---

[17] *See* 28 U.S.C. § 157(a).

[18] *See* 28 U.S.C. § 157(b)(5).

[19] *See* Order of Reference ("In accordance with 28 U.S.C. Section 157(b)(5), it is further ORDERED that all personal
injury tort and wrongful death claims arising in or related to a case under Title 11 pending in this court shall be tried
in, or as determined by, this court ***and shall not be referred by this order***") (emphasis added).

*Claims Against Benham*.   Next, with respect to Benham, a non-debtor Defendant, the analysis is slightly more complex.   Favoring jurisdiction is the critical nature of Benham's relationship to the Benham Debtor.   In particular, the Benham Debtor's ability to operate is inherently dependent upon the ability of Benham to provide orthodontic patient care services through the Benham Debtor.   Thus, to the extent that the outcome of litigation involving any of the Plaintiffs' claims against Benham could impact Benham's ability to provide such orthodontic patient care services through the Benham Debtor, then "related to" jurisdiction exists because the outcome of the litigation could correspondingly alter, positively or negatively, the Benham Debtor's rights, liabilities, options, or freedom of action and could influence administration of the Benham Debtor's bankrupt estate.   Accordingly, bankruptcy jurisdiction exists with respect to each of Counts 1, 3, 4, 5, 6, 7 and 9, to the extent asserted against Benham.

In the case of Count 2, on the other hand, the outcome of the litigation of such claim against Benham will have no conceivable impact upon the Benham Debtor or its bankruptcy estate.   The impact will be personal to Benham.   Consequently, bankruptcy jurisdiction does not exist with respect to Count 2, to the extent asserted against Benham.

Finally, in the case of Count 8, the "claim" asserted thereby is not really a cause of action per se, but rather a request for relief tied to certain of the other claims.   Thus, for simplicity and brevity, because Count 8 conceivably has a connection to Counts 3, 4 and 9, bankruptcy jurisdiction also exists with respect to Count 8, to the extent asserted against Benham.

*Claims Against BPOA*.   Finally, with respect to BPOA, another non-debtor Defendant, there is effectively no bankruptcy connection upon which to find jurisdiction.   As alleged by the Plaintiffs in the Complaint, BPOA, a limited liability company wholly owned by Benham, is the owner of certain real property leased to Five Point.   Nowhere within the Complaint is there an allegation suggesting that the outcome of the litigation of any claims against BPOA could have any impact upon the Benham Debtor's operations, the Benham Debtor's bankruptcy estate, or administration of the Bankruptcy Case.   Consequently, bankruptcy jurisdiction does not exist with respect to Counts 1, 2, 6 and 8, to the extent asserted against BPOA.

Turning next to referral authority, with the exception of Count 2 (Assault), all of the Plaintiffs' claims for which bankruptcy jurisdiction has been found to exist (as indicated above) have been referred to this Court pursuant to the Order of Reference.   In the case of Count 2, however, while bankruptcy jurisdiction exists (to the extent asserted against the Benham Debtor), because assault is a type of personal injury tort, the Count 2 claim has not been referred to this Court pursuant to the Order of Reference.   Therefore, the Court cannot and will not take any action with respect to such claim in connection with ruling on the TRO Application.

## FACTUAL BACKGROUND

Benham and Jeremy Lustig, DDS, MS ("*Lustig*") are both practicing orthodontists in north Texas.  Upon completing his orthodontic education, Benham worked with Lustig for a period of time in Lustig's practice.  During that time, Benham came to look up to Lustig as a mentor.

In or about 2008, Benham set up his own orthodontic practice (the "*Practice*") under Benham Orthodontics, P.A., and he operated the Practice under the name "Benham Orthodontics." Over a period of years, Benham successfully turned his Practice and Benham Ortho into a profitable enterprise.  This enabled him to, among other things, acquire certain real property in Frisco and McKinney through BPOA, another of his entities, and then move the Frisco and McKinney orthodontic operations to the office space owned by BPOA – specifically, 4060 Legacy Drive, Suite 303, Frisco, Texas 76034 (the "*Frisco Location*") and 5341 W. University Drive, Suite 200, McKinney, Texas 75071 (the "*McKinney Location*").

For purposes of this Order, at all relevant times Benham Ortho's Frisco office was located at the Frisco Location and Benham Ortho's McKinney office was located at the McKinney Location.  Prior to Benham's sale of his Practice, Benham was the only orthodontist who worked at those locations.

### A.    *Benham Agrees to Sell His Practice to Five Point*

Separately, Lustig and Andrew Young, DDS ("*Young*"), another practicing orthodontist in north Texas, established a combined orthodontics practice that they operate under the Five Point umbrella.  In or about April 2019, Lustig approached Benham with the idea of bringing Benham into the Five Point fold by way of Five Point's acquisition of Benham's Practice, with Benham to thereafter continue to work in the Practice and have an equity stake in the acquiring entity. Eventually, after several months of continuing communications with respect to the prospect, Benham agreed to the idea and the process began to document the transaction.

Ultimately, the following (among other) documents were executed by the parties to consummate the transaction (collectively, the "***Transactional Documents***"):

> _The APA_.  Five Point and Benham SubCo, as the "Buyers," and Benham Ortho and Benham, as "Sellers," entered into an Asset Purchase and Contribution Agreement, dated as of January 1, 2020 (the "***APA***"), to memorialize the Five Point Parties' acquisition of the Practice and Benham's go-forward joint ownership of Benham SubCo.[20]

> _The Escrow Agreement_.  Five Point, as the "Buyer," Benham, as the "Owner," and Capstar Bank, as the "Escrow Agent," entered into an Escrow Agreement, dated January 1, 2020 (the "***Escrow Agreement***"), to memorialize the parties' agreement with respect to how the Escrow Amount of the Purchase Price under the APA would be disbursed.[21]

> _The STA_.  Lustig and Young, as "Purchasers," and Benham, as "Seller," entered into a Share Transfer Agreement, dated January 1, 2020 (the "***STA***"), to memorialize Benham's agreement to transfer his ownership of Benham Ortho to Lustig and Young.[22]

> _The Employment Agreement_.  Benham Ortho, as "Employer," and Benham, as "Orthodontist," entered into an Orthodontist Employment Agreement, dated as of January 1, 2020 (the "***Employment Agreement***"), to memorialize Benham Ortho's employment of Benham and the terms thereof.[23]

> _The Frisco Location Lease_.  BPOA, as "Landlord," and Five Point, as "Tenant," entered into a Lease, dated as of January 1, 2020 (the "***Frisco Location Lease***"), pursuant to which BPOA leased the Frisco Location to Five Point.[24]

> _The McKinney Location Lease_.  BPOA, as "Landlord," and Five Point, as "Tenant," entered into a Lease, dated as of January 1, 2020 (the "**McKinney Location Lease**"), pursuant to which BPOA leased the McKinney Location to Five Point.

**B.     *The Transaction Closes***

On or about January 1, 2020, the transaction contemplated by the Transactional Documents closed.  Pursuant to the APA, in exchange for a Purchase Price of $5.0 million (discussed further

---

[20] *See* Plaintiffs' Exh. 2A (APA).

[21] *See* Plaintiffs' Exh. 2A, at App. 45-54 (Escrow Agreement).

[22] *See* Plaintiffs' Exh. 2BB (STA).

[23] *See* Plaintiffs' Exh. 2C (Employment Agreement).

[24] *See* Plaintiffs' Exh. D.

below): (a) Benham SubCo purchased all of the Purchased Assets from Benham Ortho, free and clear of all liens and encumbrances;[25] (b) Benham contributed, transferred, and assigned to Benham SubCo all of his Personal Goodwill in and related to the Practice, free and clear of all liens and encumbrances;[26] and (c) Benham SubCo assumed the Assumed Contract Liabilities and Assumed Trade Payables of Benham Ortho.[27]  Separately, pursuant to the STA, Lustig and Young purchased all of Benham's ownership interests in Benham Ortho and Benham entered into a long-term employment relationship with Benham Ortho pursuant to the Employment Agreement (discussed further below).

In relation to the $5.0 million Purchase Price, before executing the APA, Benham apparently believed that he would simply be receiving $5.0 million in cash upon closing.  Given the complexity of the transaction, however, particularly the mechanics of financially transitioning the business aspects of the Practice to Benham SubCo and then providing Benham with an ownership interest in Benham SubCo, it was not that simple.  Thus, the APA provided detail with respect to how the Purchase Price would be applied.  Specifically, pursuant to section 2.1 of the APA, the Purchase Price was to be paid (or credited) in the following manner: (a) $1,334,782.47 in the form of the issuance of the Rollover Units in Benham SubCo to Benham;[28] (b) payment of

---

[25] See APA § 1.1 and Exh. A (defining "Purchased Assets" as "all of the Acquired Assets other than the Personal Goodwill"; defining "Acquired Assets" as "all of the assets, properties, rights and interests of [Benham Ortho] (and, with respect to the Personal Goodwill, of [Benham]), whether real, personal or mixed, tangible or intangible, and all of [Benham Ortho's] rights, title and interest therein and thereto (other than and excluding the Excluded Assets), including but not limited [additional asset descriptions provided]"; and providing additional definitions for "Personal Goodwill" and "Excluded Assets").

[26] See APA § 1.2 and Exh. A (defining "Personal Goodwill" as "personal and ongoing business relationships, contacts, reputation, know-how, operational processes and other personal goodwill with respect to the Practice and its operations").

[27] See APA § 1.3 (defining "Assume Contract Liabilities" and "Assumed Trade Payables" therein).

[28] See APA §§ 1.2 and 2.1(a).  The "**Rollover Units**" are defined as 490 Class A Units in Benham SubCo, which represented a 49% membership interest in the company.

the Closing Indebtedness and Transaction Expenses to those to whom such expenses were owed;[29]

(c) payment of the Escrow Amount to the Escrow Agent, to be held, invested and distributed by

the Escrow Agent pursuant to the Escrow Agreement;[30] and (d) payment to Benham of the Closing

Payment (equal to the Purchase Price, *less* the agreed-upon value of the Rollover Units (*i.e.*,

$1,334,782.47), *less* the Closing Indebtedness, *less* the Transaction Expenses, *less* the Escrow

Amount, and subject to a net working capital adjustment (*i.e.*, either (i) plus the amount, if any, by

which the Estimated Net Working Capital exceeds the Target Net Working Capital, or (ii) less the

amount, if any, by which the Target Net Working Capital exceeds the Estimated Net Working

Capital).[31]  In executing the APA, Benham agreed to this allocation and the structure and terms of

the transaction.

In connection with the closing, Five Point provided a funds flow/sources and uses

spreadsheet to Behnam (the "***Closing Statement***").[32]  According to the Closing Statement, the

Purchase Price was allocated as follows:

---

[29] *See* APA § 2.1(b) and Exh. A (defining "***Closing Indebtedness***" as "all outstanding Indebtedness (i) of or guaranteed by [Benham Ortho] and/or (ii) secured by or encumbering [the] Practice or any of the Acquired Assets or Professional Assets or their proceeds or substitutions, in each case as of immediately prior to the Closing, but excluding any Current Liabilities"; and defining "***Transaction Expenses***" as "all fees, costs and expenses incurred by Sellers in connection with [the APA], the Closing or the other agreements and documents and transactions contemplated [in the APA], including any and all fees, costs and expenses of brokers, investment bankers, attorneys, accountants, financial advisors, appraisers and other advisors and professionals, and any bonuses, severance, change of control payments and other amounts payable by Sellers in connection with the transactions contemplated [in the APA] and associated payroll or other Taxes, in each case that are unpaid as of immediately prior to the Closing").

[30] *See* APA § 2.1(c) and Exh. A (defining "***Escrow Amount***" as the "Indemnity Escrow Amount, Overpayment Escrow Amount, and the Working Capital Escrow Amount"; and defining "***Indemnity Escrow Amount***" as "an amount equal to $500,000", "***Overpayment Escrow Amount***" as "an amount equal to $205,157.28", and "***Working Capital Escrow Amount***" as "an amount of cash equal to $100,000"; *see also* Escrow Agreement § 1.3 (providing conditions under which such amounts are to be disbursed).

[31] *See* APA §§ 2.1(d) and 2.2(a) (defining "Estimated Net Working Capital") and Exh. A (defining "Target Net Working Capital").

[32] *See* Defendants' Exh. 10.

| | |
|---|---|
| Purchase Price | $5,000,000.00 |
| Issuance of Benham SubCo Rollover Units | (1,334,782.47) |
| Payoff of Closing Indebtedness | (630,052.15) |
| Payoff of Transaction Expenses | (32,656.00) |
| Payment of Escrow Amount to Escrow Agent | |
|     Indemnity Escrow Amount | (500,000.00) |
|     Overpayment Escrow Amount | (205,157.28) |
|     Working Capital Escrow Amount | (100,000.00) |
| Closing Payment to Benham | (2,197,352.10) |
|     Remaining Balance | 0.00 |

In relation to same, Benham acknowledges that he received the SubCo Rollover Units and the Closing Payment upon closing, and that since the closing he has also received the full amount of the Indemnity Escrow Amount and the Working Capital Escrow Amount from the Escrow Agent. It appears that the Overpayment Escrow Amount (referred to as the "Escheat Escrow" in the Closing Statement) has yet to be disbursed to anyone by the Escrow Agent.

In relation to the payoff of Transaction Expenses (*i.e.*, the $32,656.00 payment to Dykema per the Closing Statement), while Benham now takes issue with any payment to Dykema based upon his claim that Dykema was either not his counsel or had a conflict of interest, no evidence was presented of Benham having timely disputed the payment in accordance with the dispute resolution procedures of the APA.[33]

## C.   *Additional Post-Closing Income Generation Opportunities*

As indicated above, following the closing Benham would continue to provide orthodontic services to patients through Benham Ortho and would participate in the financial upside of the transferred Practice by virtue of his ownership interest in Benham SubCo (*i.e.*, the Rollover Units, representing a 49% membership interest in Benham SubCo).   Additionally, Benham would indirectly obtain the benefit of rental income through BPOA on account of Five Point's lease of the offices at the Frisco Location and McKinney Location from BPOA.

---

[33] *See* APA § 2.2(b).

In relation to Benham's continuing provision of services, pursuant to the Employment Agreement, Benham Ortho and Benham agreed[34] that Benham Ortho would employ Benham during the Term (defined as a period ending on the later of 5 years after the Effective Date or 2 years after a Company Sale or FPDS Liquidity Event (each as defined in Benham SubCo's Restated Limited Liability Company Agreement), with the opportunity for automatic successive renewal terms of 2 years each, in each case subject to certain earlier termination rights), and would pay Benham an annual salary of $250,000.[35]  Additionally, Benham Ortho would provide certain benefits to Benham, including professional liability insurance coverage and Leave Time (defined as time away from the office for sick leave, vacation, and attendance at relevant professional meetings and continuing education as necessary for Benham's professional advancement), provided the taking of Leave Time did not impair the business of the Practice.[36]

Separately, in connection with the issuance of the Rollover Units in Benham SubCo to Benham, to further incentivize Benham to grow the Practice post-closing, the APA provided for Benham to also receive an Earnout Amount in exchange for his contribution, transfer, and assignment of his Personal Goodwill to Benham SubCo.[37]  With respect to same, section 2.4 of

---

[34] Of note, Lustig and Young were to acquire all of Benham's equity interests in Benham Ortho at the time of the closing, which they did, *see* Plaintiffs' Exh. 2BB; and Benham was to then immediately resign from his positions of control with Benham Ortho, which he did, *see* Plaintiffs' Exh. 2B.  With that in mind, Benham highlights the fact that he executed the Employment Agreement both on behalf of Benham Ortho and in his individual capacity, *see* Plaintiffs' Exh. 2C, and now suggests that the Employment Agreement is unenforceable because it was never validly executed by Benham Ortho due to his resignation.  Such argument lacks merit and smacks of bad faith.  Pursuant to section 3.2(d), the Sellers (*i.e.*, Benham and the pre-closing Benham Ortho) were required to deliver to Five Point at closing both the Employment Agreement duly executed by Benham and the resignation letter.  Thus, the parties clearly contemplated that the Employment Agreement would be executed prior to the closing and the effectiveness of the resignation and, because at a time at which Benham Ortho was still under the control of Benham.  Even if that were not the case, Benham acknowledged that he signed the agreement in his individual capacity, the actions of Benham Ortho since the closing clearly evidence Benham Ortho's ratification of the agreement, and both of the parties conducted their affairs post-closing under the terms of the Employment Agreement.

[35] *See* Employment Agreement §§ 1.1, 2.1 and 3.1.

[36] *See* Employment Agreement §§ 2.1, 2.2 and 2.3.

[37] *See* APA § 1.2.

the APA sets out the standards for becoming entitled to an earn-out payment, the applicable determination dates, the reporting to be provided, and the payment amounts required.  In short, the earn-out provisions entitled Benham to receive certain amounts tied to an evaluation of whether the EBIDTA of Benham SubCo for each particular Earn-Out Period exceeded the Baseline EBITDA Threshold of Benham Ortho for the 12-month period ending on the date of the closing.[38] Importantly, the APA specified that the maximum amount payable as the Earnout Amount was $1.4 million.[39]  While Benham takes issue with the timeliness of the reporting provided to him, he acknowledges that he has been paid the $1.4 million maximum.[40]

### D.    The Non-Compete, Non-Solicitation, Non-Interference, and Non-Disclosure Protections of the APA and Employment Agreement

Within the service industry (which includes dental and orthodontic practices for purposes of this discussion), it is customary for the purchaser of a competitor's business to require the inclusion of certain post-closing protective provisions within the transactional agreements to ensure that the seller is not able to turn around after the closing and engage in business activities that compete with the very same business that the seller just sold to the purchaser.  Similarly, it is customary for employers within the service industry to require their key employees to agree to non-compete, as well as non-disclosure and non-disparagement, protections upon the termination

---

[38] *See* APA § 2.4(a).

[39] *Id.*

[40] Benham claims that Benham SubCo has impermissibly caused the paid Earnout Amount to be treated as debt on Benham SubCo's balance sheet, thereby impairing the value of Benham's equity interest in Benham SubCo because the debt impairs Benham SubCo's ability to make equity distributions.  He asserts that that is not what the parties agreed to under the terms of the APA, pointing to section 2.4(b) of the APA.  While the Court is not convinced that section 2.4(b) prevents Benham SubCo from financing its payment of the Earnout Amount, *see, e.g.,* APA § 2.5 (making it clear that the Earnout Amount is to be treated as part of the consideration payable by Benham SubCo to Benham in exchange for Benham's transfer of the Personal Goodwill to Benham SubCo), the Court does find the language of section 2.4(b) to be awkward, at best.  *See* APA § 2.4(b)(1) ("The Earn-Out Amounts are, and at all times shall remain, an unsecured obligation *of Buyer*") (emphasis added); *see also* APA introductory paragraph (defining "Buyer" as Five Point).  While it is possible that at some later date the Court may permit the introduction of extrinsic evidence with respect to the parties' intent with respect to APA § 2.4(b), for current purposes the Court does not find this question to rise to the level of a possible material breach of the APA that would excuse Benham's performance.

Page 14

of employment. Five Point has followed suit, providing for such protections within both the APA and the Employment Agreement.

### 1.     *APA Protections*

First, in the case of the APA, article 7 includes a variety of restrictive covenants designed to protect the Five Point Parties and the Practice post-closing. Pursuant to section 7.2, for example, Benham agreed to be bound by the following protective provisions for a period of 5 years immediately following the Closing (the "***APA Restricted Period***") (*i.e.*, through January 1, 2025):[41]

- § 7.2(a)(A) – <u>proximity non-compete</u> provision with respect to the provision of <u>professional services</u> (*e.g.*, orthodontic, dental, corrective aligner, and similar services) (precluding activity within a 20-mile radius from the Frisco Location and the McKinney Location).

- § 7.2(a)(B) – <u>proximity non-compete</u> provision with respect to the provision of <u>non-professional, business-related services</u> to an orthodontic, corrective aligner, or dental practice or orthodontist, dentist, or dental professional (*e.g.*, management, marketing, and other business-related services) (precluding activity within the entire State of Texas and within a 20-mile radius from any location at which Five Point, any of its affiliates, and any "Supported Practice" is operating or, to Benham's knowledge, has taken affirmative steps to begin operating at any time during the APA Restricted Period).

- § 7.2(b) – <u>non-interference, non-solicitation</u> provision with respect to <u>employees and independent contractors</u> of Five Point, Benham SubCo, its affiliates, the Practice, or Benham Ortho.

- § 7.2(c)(i) – <u>non-interference, non-solicitation</u> provision with respect to <u>patients</u> of the Practice or Benham Ortho or any of their dentists or orthodontists.

- § 7.2(c)(ii) – <u>non-interference, non-solicitation</u> provision with respect to <u>customers, clients, referral sources, payors, suppliers, vendors, consultants, and other persons having a business or professional relationship</u> with the Practice, Five Point, or Benham Ortho.

- § 7.2(d) – <u>non-interference</u> provision with respect to <u>business relationships and contracts</u> between Five Point, Benham SubCo, the Practice, Benham Ortho, or any of their affiliates, on the one hand, and any provider, customer, client, patient, potential customer, client or patient, employer, referral source, payor, supplier, vendor, consultant, employee, independent contractor or other person having a business relationship with Five Point, Benham SubCo, the Practice, Benham Ortho or any of their affiliates, on the other hand.

---

[41] *See* APA § 7.2. *But see also* APA § 7.4 (providing for an extension of the APA Restricted Period in the event of a breach of any of the negative covenants).

• 7.2(e) – <u>non-disparagement</u> provision with respect to Five Point, Benham SubCo, the Practice, Benham Ortho, their affiliates, or the "Supported Practices."

Separately, pursuant to section 7.3 of the APA, Benham agreed indefinitely to be bound to certain non-disclosure requirements with respect to any trade secrets or confidential or proprietary information of or regarding Five Point, Benham SubCo, the Practice, Benham Ortho or other practices supported by Five Point or its affiliates or their affiliates.[42]  Collectively, all of the above-described protections are referred to as the "***APA Protections***."

In relation to the APA Protections, Benham agreed that in the event of an actual or threatened breach of any of them: (a) Five Point and Benham SubCo shall be entitled to seek injunctive relief; (b) Benham waives any requirement on the part of Five Point or Benham SubCo to prove actual damages or irreparable harm; (c) Benham waives the requirement of a posting of a bond; and (d) the existence of any claim or cause of action against Five Point, Benham SubCo, the Practice, Benham Ortho, or any of their affiliates, whether predicated on the APA or otherwise, will not constitute a defense to the enforcement by Five Point of the provisions of article 7 of the APA, "which will be enforceable notwithstanding the existence of any such breach."[43]

### 2.    *Employment Agreement Protections*

Next, in the case of the Employment Agreement, article 4 similarly includes a variety of restrictive covenants designed to protect Benham Ortho, Benham SubCo, and the Practice post-closing.  Pursuant to section 4.2 of the Employment Agreement, Benham agreed to be bound by the following protective provisions for a period of 2 years following the expiration or termination

---

[42] *See* APA § 7.3.

[43] *See* APA § 7.4.

of the Employment Agreement (by any means and regardless of reason) (the "***EA Restricted
Period***"):[44]

> • § 4.2(a) – <u>proximity non-compete</u> provision with respect to the provision of <u>professional
> services</u> (*e.g.*, dental and orthodontic services and related goods and services) or <u>non-
> professional, business-related services</u> to any dentist, orthodontist, dental practice, or
> dental entity (*e.g.*, management, marketing, and other business-related services)
> (precluding activity within a 20-mile radius from each facility, office, or center at which
> Benham Ortho is operating or has taken affirmative steps to develop or begin operating at
> any time during the Term).

> • § 4.2(b) – <u>non-interference, non-solicitation</u> provision with respect to <u>employees and
> independent contractors</u> of Benham Ortho or Benham SubCo.

> • § 4.2(c)(i) – <u>non-interference, non-solicitation</u> provision with respect to <u>patients</u> of
> Benham Ortho or any of its dentists or orthodontists.

> • § 4.2(c)(ii) – <u>non-interference, non-solicitation</u> provision with respect to <u>customers,
> clients, referral sources, payors, suppliers, vendors, consultants, and other persons having
> a business or professional relationship</u> with Benham Ortho or Benham SubCo.

> • § 4.2(d) – <u>non-interference</u> provision with respect to <u>business relationships and contracts</u>
> between Benham Ortho or Benham SubCo, on the one hand, and any dentist, orthodontist,
> provider, patient, customer, client, referral source, payor, supplier, vendor, consultant,
> employee, independent contractor or other person having a business or professional
> relationship with Benham Ortho or Benham SubCo, on the other hand.

> • 4.2(d) – <u>non-disparagement</u> provision with respect to Benham Ortho, the Practice, its
> providers, or Benham SubCo.

Additionally, pursuant to section 4.3 of the Employment Agreement, Benham agreed indefinitely

to be bound to the following: (a) certain non-disclosure requirements with respect to Confidential

Information (as defined in the Employment Agreement);[45] and (b) a prohibition against Benham's

direct or indirect use of, or practice or operation under, the name "Benham Orthodontics" or any

---

[44] *See* Employment Agreement § 4.2. *But see also* Employment Agreement § 4.4 (providing for an extension of the
EA Restricted Period in the event of a breach of any of the negative covenants).

[45] Pursuant to section 1.2 of the Employment Agreement, Benham also agreed that all case records, case histories, x-
ray films, patient lists, accounting and financial records, examination reports, clinical photographs, films, and personal
and regular files concerning Benham Ortho or patients of Benham Ortho shall belong to and remain the property of
Benham Ortho, and that Benham shall not remove any of such records or other documentation at any time, including
upon the termination of employment.  *See* Employment Agreement § 1.2.

variants thereof.[46]   Collectively, all of the above-described protections are referred to as the "***EA***

***Protections***."

In relation to the EA Protections, Benham agreed to the following: (a) that a breach of any

the covenants would cause irreparable damage and injury to Benham Ortho for which there is no

adequate remedy at law; (b) that in the event of an actual or threatened breach of any of the

protections, Benham waives and agrees not to assert any defense to the effect that Benham Ortho

has an adequate remedy at law; (c) that in the event of an actual or threatened breach of any of the

protections, Benham Ortho may obtain a restraining order and injunction against Benham without

the necessity of posting a bond; and (d) that the existence of any claim or cause of action of Benham

against Benham Ortho, whether predicated on the Employment Agreement or otherwise, will not

constitute a defense to the enforcement by Benham Ortho of the provisions of article 4 of the

Employment Agreement.[47]

### E.        *The Souring of the Business Relationship*

While it is not entirely clear how or why the relationship between Benham, on the one

hand, and the Five Point Parties and Lustig and Young, on the other, soured so dramatically, it

appears that the relationship began to run into serious trouble by as early as just a year after the

closing based upon missed expectations on the part of Benham as to how much he would receive

at the closing and thereafter make under the new Five Point umbrella.   Among other things, it

appears that some portion of Benham's 2020 salary may not have been fully paid in 2020.[48]   Things

only got worse thereafter when Benham faced unexplainable delays in the release of escrow funds

---

[46] *See* Employment Agreement § 4.3.

[47] *See* APA § 7.4.

[48] According to Felix Mira, Five Point's Acting Chief Operating Officer, Five Point records show that Benham was, in fact, paid the full amount of his 2020 salary, albeit from two different sources.   What he did not testify to, however, is whether all of the payments were made when due.

by the Escrow Agent and a lack of transparency and timeliness in the sharing of financial information with respect to Five Point's calculation of the Earnout Amount targets and with respect to Benham SubCo's performance.

Ultimately, by early 2024, communications between Benham and the Five Point principals had degraded to a point where they were downright heated and uncivil. This triggered a chain reaction that led to the current litigation between the parties. In particular, it appears that in the face of Five Point's continuing refusal to address certain of Benham's outstanding financial complaints and/or demands, Benham made it a point to effectively emphasize to Five Point that the Practice would not and could not survive without him, and that based upon the continuing refusal to address his demands, he would just "burn our offices to the ground" instead of supporting the Practice with his involvement.[49] Following up on that statement, Benham purportedly misinformed Benham Ortho personnel that he had been instructed to permanently discontinue providing services to patients.[50]

Given those statements, when Benham failed to show up at the Practice on February 1, 2024, for his scheduled patient appointments, the management of Benham Ortho[51] decided to terminate Benham's employment. Accordingly, they sent a letter to Benham on the same date, informing him that his employment was terminated, effective immediately, pursuant to section 3.2(d)(vi) of the Employment Agreement (the "***Termination Letter***").[52] Section 3.2(d) of the Employment Agreement provided that Benham Ortho had the right to terminate the Employment

---

[49] *See* Plaintiffs' Exh. 2F (referring to Benham's threat to "burn our offices to the ground").

[50] *See id.*

[51] It was not made clear to the Court who the members of Benham Ortho's management were at the time. However, given the connection of Lustig and Young to Benham Ortho (as its owners) and Five Point, the Court assumes that, directly or indirectly, Lustig and Young had a hand in the decision to terminate Benham. According to Benham, the Termination Letter was emailed to him by Young.

[52] *See* Plaintiff Exh. 2F (Termination Letter).

Agreement immediately at any time for Cause by providing written notice Benham.  Subpart (vi) of section 3.2(d) specified that "Cause" would exist if Benham "engages in documented illegal harassment, assault or discrimination, or conduct that is jeopardizing patient care or patient or personnel safety."[53]   Based upon the content of the Termination Letter, Benham Ortho's management relied upon the jeopardizing clause, asserting a risk to both patient care and the personal safety of patients and personnel.[54]  According to Benham, when Benham went back to the Frisco Location the next day, on February 2, 2024, he was locked out of the building.

Thereafter, Benham went about the process of attempting to make good on his assertion that the Practice would not survive without him.  Among other things, it appears that he approached those of the Practice's personnel that he believed to remain loyal to him in an effort to have them separate from Five Point and join him.  He also brainstormed on ways to communicate with his prior patients and to see those patients at other locations, and considered his options with respect to securing the Frisco Location and McKinney Location given that his company, BPOA, was the landlord of those locations.  With the foregoing in mind, on April 24, 2024, Benham organized the Benham Debtor as a new Texas professional association to render orthodontic services.  Benham listed the Frisco Location as the Benham Debtor's business address on the Certificate of Formation.[55]

---

[53] *See* Employment Agreement § 3.2(d)(iv).

[54] *See* Termination Letter (Stating "we consider your actions to be both an abandonment of your position without prior notice and a jeopardization of treatment for patients presently under your care", and in response to the "burn our offices to the ground" comments, "[we] consider these threats to materially compromise the safety of our employees and patients").

[55] *See* Plaintiffs' Exh. 2G (Certificate of Formation of the Benham Debtor).

**F.      *The Prepetition State Court Litigation and Injunctive Relief Granted***

By April 2024, matters had evolved to a point where Benham engaged legal counsel to

pursue action against the Five Point Parties and the Five Point Parties engaged legal counsel to

pursue action against Benham and BPOA.  Thus, the race to the courthouse was on.

Benham was the first to strike, initiating the State Court Case in the 471st Judicial District

Court of Collin County, Texas, on April 29, 2024, with the filing of his original petition against

the Five Point Parties.  In connection with his original petition, Benham sought and obtained an *ex*

*parte* TRO against the Five Point Parties (the "***Benham TRO***").  Pursuant to the Benham TRO,

the Five Point Parties were enjoined from, among other things, (i) withholding patient dental

records from Benham, (ii) interfering with Benham's treatment of patients at the Frisco Location

and McKinney Location, (iii) obstructing or accessing Benham's practice and treatment of patients

at the Frisco and McKinney Location, (iv) contacting employees or patients of Benham, and (v)

making any false, misleading, deceptive, or defamatory statements about Benham or his

employees, contractors, business contacts, or patients.[56]

The very same day, April 29, 2024, the Five Point Parties also filed suit in the 471st Judicial

District Court of Collin County, Texas, commencing Cause No. 471-02582-2024 (the "***Five Point***

***Case***").[57]  In their original petition, they named Benham and BPOA as defendants, and they also

requested and obtained TRO relief.  Pursuant to their TRO (the "***First Five Point TRO***"), Benham

and BPOA and their agents and representatives were enjoined[58] from (i) entering or coming within

100 yards of or on the leased premises at the Frisco Location and McKinney Location and (ii)

taking any action intended to threaten or cause harm or injury to the Frisco Location or McKinney

---

[56] *See* Defendants' Exh. 16 (Benham TRO).

[57] *See* EDTX Case, Docket No. 1 (attached Register of Actions, 4/29/2024 docket entry).

[58] The Court notes that the First Five Point TRO inadvertently omitted the words "are enjoined" from the operative ordered paragraph.  It is clear from the entirety of the order, however, that that is what the State Court intended.

Location or the Five Point Parties' owners, persons in control, employees, or other persons in, on, entering, or leaving the two locations.[59]

Clearly, the Benham TRO and First Five Point TRO conflicted.  Nevertheless, based upon the Benham TRO, Benham re-entered the Frisco Location and McKinney Location and informed anyone else who was there and not aligned with him to leave.  Thereafter, Benham began to see his prior patients and, in the process, inform them of the termination action taken by the Five Point Parties and work with them to transition their patient relationships to the Benham Debtor.

Eventually, the State Court was advised of the two separately-filed actions and entered an order consolidating the Five Point Case with the State Court Case (the first-filed case).[60] Thereafter, on May 16, 2024, the State Court entered an agreed order extending both the Benham TRO and the First Five Point TRO.[61]

On the same date, the Five Point Parties filed an amended petition to add the Benham Debtor as a defendant and requested a modified TRO.[62]  On June 13, 2024, the State Court granted the modified TRO request.  Pursuant to the modified TRO (the "***Second Five Point TRO***"), the Benham Parties (now including the Benham Debtor) and their agents and representatives were enjoined from (i) entering or coming within 100 yards of or on the leased premises at the Frisco Location and McKinney Location (except that BPOA and its representatives were permitted to enter the locations to show the premises to prospective purchasers, mortgagees and tenants and for the purposes of inspection, making repairs, and performing maintenance, subject to certain notice requirements), (ii) taking any action intended to threaten or cause harm or injury to the Frisco

---

[59] *See* Plaintiffs' Exh. 2H (First Five Point TRO).

[60] *See* EDTX Case, Docket No. 2-6 (consolidation order).

[61] *See* EDTX Case, Docket No. 1 (attached Register of Actions, 5/16/2024 docket entry).

[62] *See* EDTX Case, Docket No. 1 (attached Register of Actions, 5/16/2024 docket entry).

Location or McKinney Location or the Five Point Parties' owners, persons in control, employees, or other persons in, on, entering, or leaving the two locations, (iii) taking certain types of actions that violate the APA Protections and/or EA Protections, and (iv) taking certain types of spoliation actions.[63]  Curiously, the order did not address the terms of the conflicting Benham TRO.

On June 27, 2024, the State Court considered the parties' competing requests for conversion of their TROs into temporary injunctions.  In Benham's case, the request was denied.[64] In the Five Point Parties' case, the State Court granted the request, issuing a Temporary Injunction on June 28, 2024 (the "***Original Temporary Injunction***").  The scope of relief provided pursuant to the Original Temporary Injunction, however, was considerably more narrow than that of the Second Five Point TRO.  It solely enjoined Benham, and his agents, representatives, and employees having notice of the order, from (i) entering the Frisco Location or McKinney Location, except pursuant to any future writ or final judgment obtained from a justice court of proper jurisdiction, and (ii) causing or threatening to cause harm, damage, destruction, or injury to any person, property, or structure located at either the Frisco Location or McKinney Location.[65] Ostensibly emboldened by the narrowing of the injunctive relief pursuant to the Original Temporary Injunction, it appears that Benham continued in his effort to reach out to and treat his prior patients.

Ultimately, Benham's actions led to the Five Point Parties' filing of an emergency motion for contempt.[66]  On July 18, 2024, the State Court heard the motion and determined that the best court of action was to enter an amended temporary injunction to ensure that the court's directives

---

[63] *See* Plaintiffs' Exh. 2I (Second Five Point TRO).

[64] *See* EDTX Case, Docket No. 1 (attached Register of Actions, 6/27/2024 and 6/28/2024 docket entries).

[65] *See* Plaintiffs' Exh. 2J (Original Temporary Injunction).

[66] *See* EDTX Case, Docket No. 1 (attached Register of Actions, 7/3/2024 docket entry).

were clear.[67]   Accordingly, on July 19, 2024, the State Court entered the amended temporary injunction (the "***Amended Temporary Injunction***") pursuant to which the Benham Parties, and their agents, representatives, and all persons in active concert or participation with them who receive actual notice of the order, were enjoined from entering or coming within 100 yards of or on the leased premises at the Frisco Location and McKinney Location (except that a representative of BPOA *other than Benham* was permitted to enter the locations to show the premises to prospective purchasers, mortgagees and tenants and for the purposes of inspection, making repairs, and performing maintenance, subject to certain notice requirements), and (ii) taking certain types of actions that would violate the non-disclosure obligations of section 7.3 of the APA. Additionally, Benham, along with his agents, representatives, and all persons in active concert or participation with him who receive actual notice of the order, were enjoined from (i) causing or threatening to cause harm, damage, destruction, or injury to the Frisco Location or McKinney Location or any person or personal property located therein (other than as a defensive measure), (ii) taking certain types of actions that violate the non-compete professional services APA Protections and EA Protections, and (iii) taking certain types of action that violate the non-disclosure EA Protections.[68]

Following entry of the Amended Temporary Injunction, personnel of the Five Point Parties were able to re-enter the Frisco Location and McKinney Location.  Before doing so, Benham and his staff hurriedly removed various items of personal property from the locations.  According to Benham, he believed the property to belong to Benham or the staff members, as opposed to any of the Five Point Parties.  While ostensibly true with respect to certain of the property, it appears that among the property removed from the Frisco Location and McKinney Location were certain

---

[67] *See* EDTX Case, Docket No. 1 (attached Register of Actions, 7/18/2024 docket entry).

[68] *See* Plaintiffs' Exh. 2L (Amended Temporary Injunction).

instruments and apparatuses used in the Practice and patient trays and appliances.  Even more troubling was that certain electronically stored records and patient information appears to have been tampered with to disrupt the Five Point Parties' ability to resume the operations of the Practice.

The discovery of these things caused the Five Point Parties to hire a private investigator. With the assistance of the investigator, the Five Point Parties learned that Benham had caused the removed personal property to be moved to a Sea of Smiles office located in Frisco, Texas. Consequently, on July 23, 2024, the Five Point Parties filed a second amended petition to add Sea of Smiles Pediatric Dentistry, PLLC ("*Sea of Smiles*") as a defendant and request supplemental TRO relief.[69]   On the same date, the State Court entered the requested supplemental TRO (the "***Supplemental Five Point TRO***") pursuant to which (i) Benham, the Benham Debtor, and Sea of Smiles, along with their agents and representatives, were enjoined from removing, transporting, concealing, altering, distributing, disseminating, manipulating, destroying, or otherwise using any personal property that originated from or was located at the Frisco Location or McKinney Location prior to July 19, 2024, irrespective of any claims of ownership, and (ii) Benham, the Benham Debtor, and Seal of Smiles were ordered to return all such property to the Frisco Location or McKinney Location within 24 hours of receiving notice of the order, and providing an inventory of all such property that is not returned by the 24-hour deadline.[70]  Additionally, the Supplemental Five Point TRO made it clear that it was not meant to amend, modify, or override the Amended Temporary Injunction.[71]

---

[69] *See* EDTX Case, Docket No. 1 (attached Register of Actions, 7/23/2024 docket entries).

[70] *See* Plaintiffs' Exh. 2M (Supplemental Five Point TRO).

[71] *See id*.

Ultimately, no property was returned to the Frisco Location or McKinney Location by Benham, the Benham Debtor, or Sea of Smiles. Consequently, the Five Point Parties hired a third party to go to the Sea of Smiles location and retrieve as much of the removed property as could be determined. According to the Five Point Parties, some of the removed property is still missing, including cases of orthodontic liners and the like. This has caused a disruption to the provision of care to the Benham Ortho patients.

## G.    *Additional Actions Taken Since July 23, 2024*

Following entry of the Amended Temporary Injunction and Supplemental Five Point TRO, Benham arranged to begin practicing out of Pediatric Dentistry of Colleyville ("***PDC***") dental office located in Colleyville, Texas. While the PDC Colleyville office is more than 20 miles away from both the Frisco Location and the McKinney Location, it is located within 20 miles of other Five Point or Five Point "Supported Practice" offices. Benham has also continued in his efforts to communicate with his prior patients at Benham Ortho, encouraging them to move to Benham's new practice with the Benham Debtor operating under the name "Benham Family Orthodontics." Benham has also continued to aid his prior patients in completing the necessary paperwork to transfer their patient files to the Benham Debtor and obtain a refund or redirection of payments made on Five Point lifetime orthodontic service plans.[72]

## H.    *The Five Point Parties' Requested TRO Relief*

In the current adversary proceeding, the Plaintiffs (the Five Point Parties) seek the same type of expansive TRO relief as they obtained under the Second Five Point TRO, the Amended Temporary Injunction, and/or the Supplemental Five Point TRO. In fact, significant aspects of the

---

[72] *See* Plaintiffs' Exhs. 2N, 2P, 2S and 2Q.

requested relief are duplicative of existing relief that is in place under the Amended Temporary Injunction.

The specific injunctive relief sought by the Five Point Parties is set forth in paragraphs 150 and 151 of the Complaint (part of the TRO Application).  On August 16, 2024, the Plaintiffs filed a proposed form of TRO (the "***Proposed TRO***") that incorporates the same relief sought pursuant to paragraphs 150 and 151.[73]  At the continued hearing on August 22, 2024, counsel for the Plaintiffs presented the Court with a revised draft of the Proposed TRO, which largely leaves unaltered the ordered relief provisions of the Proposed TRO, but which does eliminate all requested relief against BPOA by removing BPOA from the definition of "Benham Parties." Consequently, the Court deems the Plaintiffs to have waived their request for any relief against BPOA pursuant to the TRO Application.

In relation to the remaining Defendants (Benham and the Benham Debtor), inasmuch as much of the relief sought pursuant to the TRO Application and Proposed TRO is duplicative of the relief already in place pursuant to the Amended Temporary Injunction, it is helpful to compare the Proposed TRO to the Amended Temporary Injunction to assess what *new* relief is actually being sought by the Plaintiffs:

| Proposed TRO Provision | Relief Provided in Amended Temporary Injunction |
|---|---|
| Page 7, ¶ a) | Plaintiffs' Exh. 2L, App.158, ¶ a |
| Page 8, ¶ b) | Plaintiffs' Exh. 2L, App.158, ¶ b |
| Page 8, ¶ c) | Plaintiffs' Exh. 2L, App.158, ¶ c (substantially identical) |
| Page 8, ¶ d) | Plaintiffs' Exh. 2L, App.158, ¶ d (only as to Benham) |
| Page 8, ¶ e) | |
| Page 8, ¶ f) | Plaintiffs' Exh. 2L, App.158, ¶ e (only as to Benham) |
| Page 8, ¶ g) | |
| Page 8, ¶ h) | Plaintiffs' Exh. 2L, App.158, ¶ f (only as to Benham) |
| Pages 8-9, ¶¶ i) – m) | |
| Page 9, ¶ n) | Plaintiffs' Exh. 2L, App.158, ¶ b |
| Pages 9-10, ¶¶ o) – t) | |

---

[73] *See* Docket No. 4 (Proposed TRO).

In response to the Plaintiffs' request for TRO relief, the Defendants argue that the Plaintiffs have failed to satisfy their burden of establishing a right to any of the TRO relief.  Additionally, the Defendants have effectively raised the following affirmative defenses: (a) the APA Protections and EA Protections of the APA and Employment Agreement are unenforceable because Benham was fraudulently induced into executing the agreements; (b) the APA Protections and EA Protections of the APA and Employment Agreement are unenforceable because the Five Point Parties (in the case of the APA) and Benham Ortho (in the case of the Employment Agreement) materially breached the agreements, thereby relieving Benham's obligation to honor such protections; (c) in the case of the non-compete provisions of the APA, they are unenforceable as against public policy to the extent that they purport to enjoin conduct beyond the 20-mile radius of the Frisco Location and McKinney Location.

## *ANALYSIS OF RELIEF SOUGHT PURSUANT TO TRO APPLICATION*

**A.    *Standard Applicable to the Provision of TRO Relief***

For each claim that is properly before the Court, to obtain injunctive TRO relief in relation thereto, the Plaintiffs must establish that (1) there is a substantial likelihood that they will prevail on the merits of such claim; (2) there is a substantial threat that irreparable harm will result to the Plaintiffs if the injunction is not granted; (3) the threatened injury to the Plaintiffs outweighs the threatened harm to the Defendants sought to be enjoined; and (4) the granting of injunctive relief will not disserve the public interest.[74]

---

[74] *See Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987); *see also Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009).

**B.**     ***Relief Already Provided in the Amended Temporary Injunction***

As previously indicated, numerous categories of relief sought pursuant to the TRO Application have already been provided to the Plaintiffs pursuant to the Amended Temporary Injunction.  Thus, to such extent, the Court declines to grant additional relief.  Not only will this protect against the possibility of having conflicting orders down the road, but the Plaintiffs cannot satisfy their burden of proving irreparable harm given the injunctive relief that is already in place.

That said, and for the avoidance of doubt, to the extent the automatic stay of 11 U.S.C. § 362 ostensibly impacts the enforceability of the Amended Temporary Injunction against the Benham Debtor, the Court will grant relief from the automatic stay to ensure that the protections afforded by the Amended Temporary Injunction are in full force and effect against the Benham Debtor.

**C.**     ***Determination of Bases for Relief Sought and Evaluation of Right to Relief***

Next, with respect to the remaining requested relief, the Plaintiffs must, among other things, establish that there is a substantial likelihood that they will prevail on the merits of the applicable claim supporting the injunctive relief sought.  Hence, it is necessary to consider which of the Plaintiffs' claims apply to the particular injunctive relief being sought.  On this point, the Plaintiffs have provided little in the way of guidance.  Thus, the Court has attempted to map out the connections, as follows:

| Proposed TRO Provision | Nature of Relief Sought | Ostensible Applicable Claim(s) |
|---|---|---|
| Page 8, ¶ d) | Prevention of assault (re Benham Debtor only) | Count 2 – Assault |
| Page 8, ¶ e) | Action re 7/19/2024 removed property | Count 9 – Conversion |
| Page 8, ¶ f) | Non-compete re profess. services (re Benham Debtor only) | Count 6 – Tortious Interference |
| Page 8, ¶ g) | Non-compete re non-professional services | Count 3 – Breach of APA<br>Count 6 – Tortious Interference |
| Page 8, ¶ h) | Retention of confi/proprietary info (re Benham Debtor only) | Count 6 – Tortious Interference<br>Count 7 – DUTSA |
| Page 8, ¶ i) | Non-interference/solicitation – employees/indep. contractors | Count 3 – Breach of APA<br>Count 6 – Tortious Interference |
| Page 8, ¶ j) | Non-interference/solicitation – patients | Count 4 – Breach of Employment Agmt<br>Count 6 – Tortious Interference |
| Page 9, ¶ k) | Non-interference/solicitation – vendors/service providers | Count 4 – Breach of Employment Agmt<br>Count 6 – Tortious Interference |
| Page 9, ¶ l) | Disparagement | Count 3 – Breach of the APA<br>Count 6 – Tortious Interference |
| Page 9, ¶ m) | Non-compete re name use | Count 4 – Breach of Employment Agmt<br>Count 6 – Tortious Interference |
| Page 9, ¶ o) | Spoliation prevention | |
| Page 9, ¶ p) | Return of property taken from Frisco or McKinney Locations | Count 9 – Conversion |
| Page 9, ¶ q) | Provision of inventory of non-returned property | Count 8 – Accounting |
| Page 9, ¶ r) | Provision of inventory of electronic equipment | |
| Page 10, ¶ s) | Identification of parties to whom confi info disclosed | |
| Page 10, ¶ t) | Identification of persons contacted since 4/29/2024 re services | |

### 1.    *Relief Sought Based Upon the Assault Claim*

First, with respect the requested injunctive relief against the Benham Debtor predicated upon Count 2 (Assault) – *i.e.*, Proposed TRO ¶ d) – because Count 2 is not properly before the Court given the terms of the Order of Reference, the Court will deny this aspect of the TRO Application without prejudice.

### 2.    *Relief Sought Based Upon the Conversion Claim*

To prevail on a claim for conversion under Texas law, a plaintiff must show that (1) the plaintiff owned, possessed, or had the right to immediate possession of personal property, (2) the

defendant unlawfully and without authorization exercised dominion or control over the property

to the exclusion of, or inconsistent with, the plaintiff's rights, and (3) the plaintiff suffered injury.[75]

In relation to Count 9 (Conversion), pursuant to the TRO Application and Proposed TRO,

the Plaintiffs request that Benham and the Benham Debtor (and their related parties) be enjoined

from taking the following action:

> Proposed TRO ¶ e). "Removing, transporting, concealing, altering, distributing, disseminating, manipulating, destroying, or otherwise using any personal property that originated from or was located at the McKinney [Location] and/or Frisco [Location] prior to July 19, 2024, irrespective of any claims of ownership of the personal property."

Separately, the Plaintiffs request that Benham and the Benham Debtor be compelled to take the

following action:

> Proposed TRO ¶ p). "Return to the Frisco [Location] all personal property the Benham Parties removed from the Frisco [Location] or the McKinney [Location]."

Applying the TRO standards, the Court finds as follows:

(1) *Substantial Likelihood of Success*.  Based upon Benham's removal of personal property from the Frisco Location and McKinney Location on July 19, 2024, and failure to thereafter return all such items as required by the Supplemental Five Point Order, there is a substantial likelihood that the Plaintiffs will prevail on the merits of the conversion claim, but only to the extent the personal property at issue is personal property that the Plaintiffs owned and/or had the right to possess to the exclusion of the Defendants as of July 19, 2024.

(2) *Irreparable Injury*.  Because of the failure of Benham and the Benham Debtor to return such personal property to the Plaintiffs after being ordered to do so pursuant to the Supplemental Five Point TRO, there is a substantial threat that irreparable harm will result to the Plaintiffs if the above injunctive relief (as narrowed) is not granted.

(3) *Balancing of Harm*.  By limiting the relief to only that personal property that the Plaintiffs owned and/or had the right to possess to the exclusion of the Debtors, the threatened injury to the Plaintiffs in the absence of such injunctive relief clearly outweighs any threatened harm to Benham and the Benham Debtor if the injunctive relief is provided.

(4) *Public Interest*.  The granting of such injunctive relief (as narrowed) will not in any way disserve the public interest.

---

[75] *See Bookout v. Shelley*, No. 02-22-00055-CV, 2022 WL 17173526, at *22 (Tex. App. – Fort Worth Nov. 23, 2022, no pet.).

Therefore, the TRO Application will be granted to the extent of the requested relief in ¶¶ e) and p) of the Proposed TRO, but only with respect to personal property that the Plaintiffs owned and/or had the right to possess to the exclusion of the Defendants as of July 19, 2024.

### 3.   *Relief Sought Based Upon the Breach of APA Claim And Associated Tortious Interference Claim*

The APA is governed by Delaware law.[76]   The elements for breach of contract under Delaware law are: (1) the existence of a contract; (2) a breach of an obligation imposed by that contract; and (3) damages.[77]   In the case of tortious interference with an existing contract, any alleged tortious interference with the APA took place within Texas.  Under Texas law, the elements of tortious interference with an existing contract are: (1) an existing contract subject to interference; (2) a willful and intentional act of interference with the contract; (3) that proximately caused the plaintiff's injury; and (4) resulting in actual damages or loss.[78]

The Defendants assert that, even if the Plaintiffs have shown that Benham took action in contravention of the terms of the APA, it does not matter because the APA was unenforceable on account of fraudulent inducement, or due to a prior material breach on the part of the Five Point Parties, or in relation to the applicable APA non-compete provision, as against public policy to the extent the provision precludes activity beyond 20 miles of the Frisco Location and McKinney Location.  Following up on these defenses, the Defendants assert that the Benham Debtor likewise cannot be held liable for having tortiously interfered with the APA.

In relation to the foregoing, to establish the affirmative defense of fraudulent inducement under Delaware law, a defendant bears the burden of proving that the defendant's assent to the

---

[76] *See* APA § 8.6.

[77] *See Adviser Invs., LLC v. Powell*, C.A. No. 2022-1149-MAA, 2023 WL 6383242, at *8 (Del Ch. Sept. 29, 2023).

[78] *See Prudential Ins. Co. of Am. v. Financial Review Servs., Inc*., 29 S.W.3d 74, 77 (Tex. 2000).

contract at issue was (1) induced by either a fraudulent or a material misrepresentation by the other party to the contract, and (2) the defendant's reliance on such misrepresentation was justifiable.[79] Next, with respect to the affirmative defense of an earlier breach, under Delaware law a party is excused from performance under a contract if the other party is in material breach thereof.[80]  The question of materiality is one of degree and is determined by weighing the consequences in the light of the actual custom of men in the performance of contracts similar to the one at issue.[81] Finally, with respect to the enforceability of a non-compete provision under Delaware law, "[t]o be enforceable, a covenant not to compete must [among other things] be reasonable in scope and duration, both geographically and temporally" and the covenant must "advance a legitimate economic interest of the party enforcing the covenant."[82]

In relation to Count 3 (Breach of the APA) and Count 6 (Tortious Interference with Existing Contracts) (to the extent focused on the APA), pursuant to the TRO Application and Proposed TRO, the Plaintiffs request that Benham and the Benham Debtor (and their related parties) be enjoined from taking the following actions:

> Proposed TRO ¶ g). "Providing management, business, marketing, or other support services to any orthodontic, corrective aligner or dental practice or orthodontist, dental or dental professional anywhere within the State of Texas and anywhere within a twenty (20) mile radius extending in all directions from the location of each location at which the Five Point Parties are currently operating."
>
> Proposed TRO ¶ i). "Soliciting, recruiting, inducing, persuading, or encouraging any person who then is, or at any time during the then preceding twenty-four (24) months from January 1, 2020, was, an employee or independent contractor of the Five Point Parties to modify or terminate his or her employment or engagement or to become employed or engaged by any other person."

---

[79] *See Griffin Corp. Servs., LLC v. Jacobs*, No. Civ.A.396-N, 2005 WL 2000775, at *10 n.62 (Del. Ch. Aug. 11, 2005) (quoting Restatement (Second) of Contracts § 164 (1981)).

[80] *See Biolife Solutions, Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. 2003).

[81] *See id.*

[82] *Intertek Testing Servs. NA, Inc. v. Eastman*, C.A. No. 2022-0853-LWW, 2023 WL 2544236, at *3 (Del. Ch. Mar. 16, 2023) (quoting *Weichert Co. of Pa. v. Young*, 2007 WL 4372823, at *3 (Del. Ch. Dec. 7, 2007)).

Proposed TRO ¶ l). "Disparaging or making derogatory statements (orally, in writing, social media, electronically or otherwise) regarding the Five Point Parties and their respective affiliates."

Applying the TRO standards, the Court finds as follows:

(1) *Substantial Likelihood of Success*.  The above requested injunctive language ties to the APA Protections set forth in §§ 7.2(a)(B), 7.2(b), and 7.2(e) of the APA.  In the case of Proposed TRO ¶¶ g) and i), the Plaintiffs have presented evidence of Benham having taken, and continuing to take, actions in contravention of §§ 7.2(a)(B) and 7.2(b) of the APA, which are the predicates for such TRO relief.  Benham organized the Benham Debtor to facilitate Benham's pursuit of such prohibited objectives, and thus the Benham Debtor has interfered, and continues to interfere, with the APA in such regard.  In the case of Proposed TRO ¶ l), which is predicated upon APA § 7.2(e), the record is significantly less clear.  Noting that "disparagement" is generally recognized as "the publication of false and injurious statements that are derogatory of another's property, business, or product,"[83] none of the evidence presented reflects a statement that was convincingly both false and injurious.

Turning to the Defendants affirmative defenses, in the case of fraudulent inducement, the Court did not find compelling Benham's assertion that he was lured into signing the APA by assurances that he would receive substantially more income than he has received.  Among other things, pursuant to the APA, Benham represented and warranted that he was an informed and sophisticated investor, and had engaged advisors, experienced in transactions of the type contemplated by the APA.  He further acknowledged that he was informed of the risks of the transactions and that he had relied upon no representations other than those contained in the APA, in the Ancillary Agreements, or in the Limited Liability Agreement of Benham SubCo.  Finally, he acknowledged that he had not relied upon any implied representations or warranties as to the prospects or the likelihood of success of Benham SubCo or Benham Ortho.[84]

Turning to the assertion of a prior material breach, while it appears that the Five Point Parties have failed to timely provide reporting with respect to the Earnout Amount payments, the Court does not find such failures to be material given the payment to Benham of the maximum amount of the Earnout Amount payable under the APA.  Separately, with respect to questions about amounts apparently still held in escrow and whether Benham SubCo was carrying debt on its balance sheet in the same amount of the Earnout Amount payments, the evidence was murky at best, and not suggestive of any failures that rise to the level of materiality excusing ongoing performance.

Finally, with respect to the enforceability of the non-compete provisions of APA § 7.2(a)(B), the Court fails to see how precluding Benham from performing any managerial/business-related services tied to the dental/orthodontic field throughout the entirety of Texas and, in particular, beyond 20 miles of the Frisco Location and McKinney Location will advance any *legitimate* economic interest of the Five Point Parties given that the non-compete

---

[83] *See* "disparagement." *Merriam-Webster.com*. 2024. https://www.merriam-webster.com (26 August 2024).

[84] *See* APA § 4.19.

limitations applicable to Benham's provision of dental/orthodontal patient care services (*i.e.*, APA § 7.2(a)(A)) are confined to within 20 miles of the Frisco Location and McKinney Location.

Thus, based upon the foregoing and in summary, the Court finds that there is a substantial likelihood that the Plaintiffs will prevail on the merits of their breach of APA claim and corresponding tortious interference with contract claim in relation to APA §§ 7.2(a)(B) and 7.2(b); *provided, however*, that in relation to APA § 7.2(a)(B), the substantial likelihood of success is limited to violative actions taken within a 20 mile radius of the Frisco Location and McKinney Location and not beyond. On the other hand, the Court does not find that there is a substantial likelihood that the Plaintiffs will prevail on the merits of their breach of APA claim and associated tortious interference claim in relation to APA § 7.2(e).

(2) *Irreparable Injury*. Because of the repetitive violations of APA §§ 7.2(a)(B) (as limited) and 7.2(b) by Benham, and Benham's use of the Benham Debtor in connection therewith, there is a substantial threat that irreparable harm will result to the Plaintiffs if the injunctive relief set forth in ¶¶ g) and i) of the Proposed TRO (as narrowed in the case of ¶ g)) is not granted.

(3) *Balancing of Harm*. Given the nature of the violative actions involved, the ability of Benham and the Behnam Debtor to stop violating/interfering with the APA Protections at issue, and the ability of Benham and the Benham Debtor to conduct business operations in a way that will not violate/interfere with the APA Protections at issue, the threatened injury to the Plaintiffs in the absence of such injunctive relief clearly outweighs any threatened harm to Benham and the Benham Debtor if the injunctive relief is provided.

(4) *Public Interest*. The granting of such injunctive relief (as narrowed) will not in any way disserve the public interest.

Therefore, the TRO Application will be granted to the extent of the requested relief in ¶¶ g) and i) of the Proposed TRO, but in the case of ¶ g), limited to the 20-mile radius of the Frisco Location and McKinney Location, and in the case of ¶ i), simplified in terminology. The TRO Application will be denied with respect to the relief requested in Proposed TRO ¶ l).

### 4.    Relief Sought Based Upon the Breach of Employment Agreement Claim and Associated Tortious Interference Claim

The Employment Agreement is governed by Texas law.[85] The elements for breach of contract under Texas law are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) resulting damages

---

[85] *See* Employment Agreement § 5.3 and Recital A (defining "State" as the State of Texas).

to the plaintiff.[86]  In the case of tortious interference with an existing contract, the elements under Texas law are set out above.

The Defendants again assert that, even if the Plaintiffs have shown that Benham took action in contravention of the terms of the Employment Agreement, it does not matter because the Employment Agreement was unenforceable on account of fraudulent inducement or due to a prior material breach on the part of Benham Ortho.  Following up on these defenses, the Defendants assert that the Benham Debtor likewise cannot be held liable for having tortiously interfered with the Employment Agreement.

In relation to the foregoing, to establish the affirmative defense of fraudulent inducement to a breach of contract claim under Texas law, a defendant bears the burden of proving that (1) there was a material representation made that was false, (2) the party who made the representation knew that it was false or made it recklessly as a positive assertion without any knowledge of its truth, (3) the party making the representation intended to induce action upon the representation, and (4) the representation was actually and justifiably relied upon, thereby causing injury.[87]  Next, with respect to the affirmative defense of an earlier breach, under Texas law, when one party to a contract commits a material breach of that contract, the other party is discharged from further performance.[88]  In determining whether a breach is material, the following factors should be considered: (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of the benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to

---

[86] *See Rice v. Metropolitan Life Ins. Co.*, 324 S.W.3d 660, 666 (Tex. App. – Fort Worth 2010, no pet.).

[87] *See Atlas Props, Inc. v. Republic Waste Servs. of Tex., Ltd.*, No. 02-11-00332-CV, 2012 WL 579442, at *2 (Tex. App. – Fort Worth Feb. 23, 2012, no pet.).

[88] *See Bartush-Schnitzius Foods Co. v. Cimco Refrigeration*, 518 S.W.3d 432, 436 (Tex. 2017).

perform or to offer to perform will cure his failure, taking account of the circumstances, including any reasonable assurances; and (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.[89]

In relation to Count 4 (Breach of the Employment Agreement) and Count 6 (Tortious Interference with Existing Contracts) (to the extent focused on the Employment Agreement), pursuant to the TRO Application and Proposed TRO, the Plaintiffs request that Benham and the Benham Debtor (and their related parties) be enjoined from taking the following actions:

> Proposed TRO ¶ j). "Soliciting, recruiting, inducing, persuading, or encouraging any person who then is, or at any time during the then preceding twenty-four (24) months from January 1, 2020, was, a patient of Benham Ortho, the [Practice at the Frisco Location], or [the Practice at the McKinney Location] or any of their dentists or orthodontists to terminate or otherwise interfere with his or her patient relationship with Benham Ortho or to receive any orthodontic, aligner or dental services, treatment or consultation from any other person."

> Proposed TRO ¶ k). "Soliciting, recruiting, inducing, persuading, or encouraging any person who then is, or at any time during the then preceding twenty-four (24) months from January 1, 2020, was, a vendor or service provider of Benham Ortho, the [Practice at the Frisco Location], or [the Practice at the McKinney Location], or any of their dentists or orthodontists to terminate or otherwise interfere with their business relationship with Benham Ortho."

> Proposed TRO ¶ m). "Neither directly nor indirectly using, practicing, or operating under 'Benham Orthodontics' or any variants thereof, including, but not limited to, 'Benham Orthodontics & Associates PA.'"

Applying the TRO standards, the Court finds as follows:

(1) *Substantial Likelihood of Success.* The above requested injunctive language ties to the EA Protections set forth in §§ 4.2(c)(i), 4.2(c)(ii), and 4.3 of the Employment Agreement. In the case of Proposed TRO ¶ j), the Plaintiffs have presented evidence of Benham having taken, and continuing to take, actions in contravention of § 4.2(c)(i) of the Employment Agreement, which is the predicate for such TRO relief. In the case of Proposed TRO ¶ k), which is predicated upon Employment Agreement § 4.2(c)(ii), the Plaintiffs have presented evidence of Benham having taken action in relation to Benham Ortho's relationship with Ortho-fi that violates § 4.2(c)(ii) of the Employment Agreement, which is the predicate for such TRO relief;[90] however, the Plaintiffs have failed to present evidence of Benham's interference with any other vendor or service provider

---

[89] *See id.* at 436-37 (citing *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 199 (Tex. 2004)).

[90] *See* Plaintiffs' Exh. 2N.

relationships with Benham Ortho.  Finally, in the case of Proposed TRO ¶ m), which is predicated upon Employment Agreement § 4.3, the Plaintiffs have presented evidence of Benham's violation of the name use limitations by, among other things, establishing a new professional association under the name "Benham Orthodontics & Associates PA" (the Benham Debtor) and, through it, practicing under the name "Benham Family Orthodontics."[91]   In each case, because Benham's actions have been taken by and through, or in concert with, the Benham Debtor, the Plaintiffs have also introduced evidence of the Benham Debtor's tortious interference with the Employment Agreement.

Turning to the Defendants affirmative defenses, in the case of fraudulent inducement, the Defendants rely upon the same arguments made in relation to the APA.  Therefore, for the same reasons discussed above, the Court did not find compelling Benham's assertion that he was lured into signing the Employment Agreement by assurances that he would receive substantially more income than he has received.

Turning to the assertion of a prior material breach, Benham appears to assert two different grounds.  First, he claims that he was not paid the full amount of his $250,000 salary in 2020.  According to Mr. Mira, however, payments were made from two different sources and provided Benham with the full amount of his 2020 salary.  Thus, given the fact that this question did not arise until the litigation was initiated in 2024, it appears that Benham was, in fact, paid the full amount of his 2020 salary, but that some portion of it was not paid in 2020.  While the failure to timely comply with the salary provisions of the Employment Agreement may constitute a breach, the fact that the full amount has been paid causes any such breach to not be of a material nature excusing all further performance by Benham.  Separately, Benham suggests that his immediate firing on February 1, 2024, failed to comply with the termination provisions of Employment Agreement § 3.2(d)(vi).  However, the Plaintiffs presented evidence of a sufficient nature to warrant action under § 3.2(d)(vi).

Thus, based upon the foregoing and in summary, the Court finds that there is a substantial likelihood that the Plaintiffs will prevail on the merits of their breach of Employment Agreement claim and corresponding tortious interference with contract claim in relation to Employment Agreement §§ 4.2(c)(i), 4.2(c)(ii), and 4.3; *provided, however*, that in relation to Employment Agreement § 4.2(c)(ii), the substantial likelihood of success is limited to violative actions taken in relation to Ortho-fi.

(2) *Irreparable Injury*.  Because of the repetitive violations of Employment Agreement §§ 4.2(c)(i), 4.2(c)(ii)(as limited) and 4.3 by Benham, and Benham's use of the Benham Debtor in connection therewith, there is a substantial threat that irreparable harm will result to the Plaintiffs if the injunctive relief set forth in ¶¶ j), k) and m) of the Proposed TRO (as narrowed in the case of ¶ k)) is not granted.

(3) *Balancing of Harm*.  Given the nature of the violative actions involved, the ability of Benham and the Behnam Debtor to stop violating/interfering with the EA Protections at issue, and the ability of Benham and the Benham Debtor to conduct business operations in a way that will not violate/interfere with the EA Protections at issue, the threatened injury to the Plaintiffs in the

---

[91] *See, e.g.*, Plaintiffs' Exh. 2Q.

absence of such injunctive relief clearly outweighs any threatened harm to Benham and the Benham Debtor if the injunctive relief is provided.

(4) *Public Interest*.  The granting of such injunctive relief (as narrowed) will not in any way disserve the public interest.

Therefore, the TRO Application will be granted to the extent of the requested relief in ¶¶ j), k) and m) of the Proposed TRO, but in the case of ¶ k), limited to Benham Ortho's business relationship with Ortho-fi, and in the case of ¶¶ j) and k), simplified in terminology.

### 5.    *Relief Sought in Relation to Provision of Professional Services Based Upon Tortious Interference Claim*

Pursuant to the Amended Temporary Injunction, Benham (and his related parties) are enjoined from "[p]roviding any orthodontic, corrective aligner, or dental services or any ancillary services related thereto or otherwise competing with the Five Point Parties within a twenty (20) mile radius extending in all directions from the Frisco [Location] and the McKinney [Location]."[92] The Plaintiffs seek to extend the injunctive protection to the Benham Debtor (and its related parties) as well pursuant to Count 6 (Tortious Interference with Existing Contracts) (related to the Employment Agreement).  The elements of tortious interference with an existing contract under Texas law are set out above.

In relation to Count 6, pursuant to the TRO Application and Proposed TRO, the Plaintiffs request that the Benham Debtor (and its related parties) be enjoined from taking the following actions:

Proposed TRO ¶ f). "Providing any orthodontic, corrective aligner, or dental services or any ancillary services related thereto or otherwise competing with the Five Point Parties within a twenty (20) mile radius extending in all directions from the Frisco [Location] and the McKinney [Location]."

Applying the TRO standards, the Court finds as follows:

---

[92] *See* Plaintiffs' Exh. 2L, App. 158, ¶ e.

(1) *Substantial Likelihood of Success*.  The above requested injunctive language ties to the EA Protections set forth in § 4.2(a) of the Employment Agreement.  The Plaintiffs have presented evidence of Benham having taken, and continuing to take, actions in contravention of such section.  Benham's organization of the Benham Debtor to facilitate Benham's pursuit of prohibited objectives is interfering with Benham's obligations under § 4.2(a) of the Employment Agreement.

(2) *Irreparable Injury*.  Because of the repetitive violations of Employment Agreement § 4.2(a) by Benham, and Benham's use of the Benham Debtor in connection therewith, there is a substantial threat that irreparable harm will result to the Plaintiffs if the injunctive relief set forth in ¶ f) of the Proposed TRO is not granted against the Benham Debtor.

(3) *Balancing of Harm*.  Given the nature of the violative actions involved, the ability of the Benham Debtor to stop interfering with the EA Protections at issue, and the ability of the Benham Debtor to conduct business operations in a way that will not interfere with the EA Protections at issue, the threatened injury to the Plaintiffs in the absence of such injunctive relief clearly outweighs any threatened harm to the Benham Debtor if the injunctive relief is provided.

(4) *Public Interest*.  The granting of such injunctive relief will not in any way disserve the public interest.

Therefore, the TRO Application will be granted to the extent of the requested relief in ¶ f) of the Proposed TRO with respect to the Benham Debtor.

### 6.      *Relief Sought in Relation to Confidential Information Based Upon Tortious Interference Claim and Delaware Uniform Trade Secrets Act*

Pursuant to the Amended Temporary Injunction, Benham (and his related parties) are enjoined from retaining any originals or copies of materials, property, documents, data, and any other information obtained by Benham during his employment with Benham Ortho.[93]  The Plaintiffs seek to extend the injunctive protection to the Benham Debtor (and its related parties), ostensibly pursuant to Count 6 (Tortious Interference with Existing Contracts) (related to the Employment Agreement) and/or Count 7 (Violation of Delaware Uniform Trade Secrets Act).  The elements of tortious interference with an existing contract under Texas law are set out above.  In the case of the Delaware Uniform Trade Secrets Act ("**DUTSA**"), section 2002 of the DUTSA

---

[93] *See* Plaintiffs' Exh. 2L, App. 158, ¶ f.

provides that "[a]ctual or threatened misappropriation may be enjoined."[94]  For purposes of such

provision, "misappropriation" includes the "[a]cquisition of a trade secret of another by a person

who knows or has reason to know that the trade secret was acquired by improper means."  And

"trade secret" is defined as "information, including a formula, pattern, compilation, program,

device, method, technique or process that: a. [d]erives independent economic value, actual or

potential, from not being generally known to, and not being readily ascertainable by proper means

by, other persons who can obtain economic value from its disclosure or use; and b. [i]s the subject

of efforts that are reasonable under the circumstances to maintain its secrecy."[95]

In relation to Counts 6 and 7, pursuant to the TRO Application and Proposed TRO, the

Plaintiffs request that the Benham Debtor (and its related parties) be enjoined from taking the

following actions:

> Proposed TRO ¶ h).  "Retaining any originals or copies of materials, property,
> documents, data, and any other information obtained by Benham during his
> employment with Benham Ortho."

Applying the TRO standards, the Court finds as follows:

(1)  *Substantial Likelihood of Success*.  The above requested injunctive language does not
cleanly tie to any of the APA Protections or EA Protections within the APA and Employment
Agreement.  At best, the proposed injunctive language loosely relates to language within the APA
and Employment Agreement that is designed to protect trade secrets and other confidential
information.  But the proposed injunctive language does not expressly refer to either trade secrets
or confidential information.  Hence, because of the absence of a solid connection between the
proposed injunctive language and any particular provision of the APA or Employment Agreement,
the Court does not find that there is a substantial likelihood that the Plaintiffs will prevail on the
merits of their tortious interference claim to the extent relied upon to pursue the broad injunctive
language proposed above.  Separately, in the case of the DUTSA, the only conduct of which the
Plaintiffs have presented evidence took place in Texas.  "The Delaware Uniform Trade Secrets
Act, however, does not apply extraterritorially."[96]  Therefore, the Court does not find that there is
a substantial likelihood that the Plaintiffs will prevail on the merits of their DUTSA claim against
the Benham Debtor.

---

[94] *See* 6 Del. C. § 2002(a).

[95] *See* 6 Del. C. § 2001(2)(a) and (4).

[96] *Sorrento Therapeutics, Inc. v. Mack*, C.A. No. 2021-0210-PAF, 2023 WL 5670689, at *29 (Del. Ch. Sept. 1, 2023).

(2)  *Other TRO Requirements*.  Because the Plaintiffs have failed to establish a substantial likelihood of success on any underlying claims, it is unnecessary to consider the other requirements for TRO relief.

Therefore, the TRO Application will be denied in relation to the relief requested in ¶ h) of the Proposed TRO.

### 7.    *Relief Sought Based Upon Accounting Claim*

With respect to Count 8 of the Plaintiffs' Complaint (requesting an accounting), the Plaintiffs recognize that the ordering of an accounting is an equitable remedy that a court may provide in relation to determined liability on a cause of action.[97]  Here, there has not yet been a determination of liability on any cause of action.  Notwithstanding same, pursuant to the TRO Application and ¶ q) of the Proposed TRO, the Plaintiffs request that Benham and the Benham Debtor be ordered to immediately provide a full inventory of all personal property removed from the Frisco Location and McKinney Location that cannot be returned to the Plaintiffs.

Such request is premature, as there has been no determination of liability on an underlying cause of action.  Additionally, the Plaintiffs have failed to substantiate how they will be irreparably injured in the absence of such relief.  In this regard, the request only seeks information with respect to personal property *that cannot be returned*.  Moreover, this is the type of information that the Plaintiffs may request through discovery.

Consequently, the TRO Application will be denied to the extent of the requested relief in ¶ q) of the Proposed TRO.

### 8.    *Discovery-Based Relief Sought That is Not Tied to Particular Claim*

Finally, pursuant to the TRO Application and ¶¶ o), r), s) and t) of the Proposed TRO, the Plaintiffs effectively request that Benham and the Benham Debtor (and their related parties) be

---

[97] *See* Complaint ¶ 126.

prohibited from taking any sort of action that would constitute the spoliation of evidence, and that

Benham and the Benham Debtor be compelled to provide various forms of discovery-type

information.  These forms of relief are not appropriate for inclusion within a TRO under the facts

and circumstances of this case.  Every party to this litigation is under an obligation to prevent

against the spoliation of evidence.  And every party to this litigation is entitled to pursue discovery.

As such, the TRO Application will be denied to the extent of the requested relief in ¶¶ o), r), s)

and t) of the Proposed TRO.

### *CONCLUSION*

Based upon the foregoing, the Court will separately issue a temporary restraining order that

grants in part, and denies in part, the TRO Application and grants temporary injunctive relief

consistent with the terms hereof.

# # #   END OF MEMORANDUM OPINION   # # #