

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed December 23, 2024**

_____

**United States Bankruptcy Judge**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| **IN RE BENHAM ORTHODONTICS & ASSOCIATES, P.A.,** | § § § | **Case No. 24-42784-elm** **Chapter 11** |
| **Debtor.** | § | |
| ------------------------------------------------- | § | ----------------------------------------- |
| **FIVE POINT DENTAL SPECIALISTS, INC., FPDS BENHAM SUB, LLC, and BENHAM ORTHODONTICS, P.A.,** | § § § § | |
| **Plaintiffs,** | § § | |
| **v.** | § § | **Adv. No. 24-04068** |
| **ADAM BENHAM, DDS, MS, BENHAM PROPERTY OWNERS ASSOCIATION, LLC, and BENHAM ORTHODONTICS & ASSOCIATES, P.A.,** | § § § § § | |
| **Defendants.** | § | |

### <u>MEMORANDUM OPINION</u>
**[Application for Preliminary Injunction]**

### *INTRODUCTION*

Before the Court for determination in this adversary proceeding is the application (the "***PI***

***Application***") of Plaintiffs Five Point Dental Specialists, Inc., FPDS Benham Sub, LLC, and

Benham Orthodontics, P.A. (collectively, "***Plaintiffs***" or the "***Five Point Parties***") for entry of a preliminary injunction against Defendants Adam Benham, DDS, MS ("***Benham***") and Benham Orthodontics & Associates, P.A. (the "***Benham Debtor***," and together with Benham, the "***Targeted Defendants***").[1]  Previously, for reasons stated within the *Memorandum Opinion* issued by the Court on August 27, 2024 (the "***Prior Opinion***"), the Court entered a *Temporary Restraining Order* against the Targeted Defendants (the "***Adversary TRO***").[2]  The Prior Opinion is incorporated herein by reference and, unless separately defined herein, all capitalized terms used herein shall have the meanings ascribed to them in the Prior Opinion.

As explained in the Prior Opinion, this adversary proceeding involves a dispute between the Five Point Parties, on the one hand, and Benham and certain of his affiliates, including the Benham Debtor, on the other hand, arising out of the sale of Benham's orthodontic practice to the Five Point system in 2020.  As relevant to the PI Application, the Plaintiffs have asserted the following claims against the Targeted Defendants within their Complaint:

> Count 3 – Breach of the APA (against Benham)
> Count 4 – Breach of the Employment Agreement (against Benham)
> Count 5 – Tortious Interference with Existing and Prospective Contracts and Business Relationships (against Benham and the Benham Debtor)
> Count 6 – Tortious Interference with Existing Contracts (against the Benham Debtor)
> Count 9 – Conversion (against Benham and the Benham Debtor)

The PI Application is also included within the Complaint.[3]

---

[1] Plaintiffs originally sought preliminary injunctive relief against all of the Defendants pursuant to the PI Application. However, they have since scaled back the request to only the Targeted Defendants.

[2] *See* Docket Nos. 25 (Prior Opinion) and 26 (Adversary TRO).  By agreement of the parties, the Adversary TRO has remained in full force and effect pending the Court's determination of the PI Application.  *See* Adversary TRO, at p.5 and n.5.

[3] *See* Complaint ¶¶ 153-154 (also cross-referencing the TRO Application assertions made within ¶¶ 144-152 of the Complaint).

Since the time of the Court's entry of the Adversary TRO, each of the Targeted Defendants has filed an answer in opposition to the Complaint.[4]  Additionally, both Benham and the Plaintiffs have filed a trial brief in relation to the PI Application.[5]  Finally, Plaintiffs have filed their proposed form of preliminary injunction (the "***Proposed PI***").[6]

On September 26, October 11, and October 18, 2024, the Court conducted an evidentiary hearing on the PI Application.  Having now reviewed the Complaint, including the PI Application, the Targeted Defendants' answers, the parties' trial briefs, the Proposed PI, the evidence presented,[7] and the representations and arguments of counsel, the Court supplements the findings and conclusions of the Prior Opinion with the additional findings and conclusions set forth herein, determining that the PI Application should be granted in part, and denied in part, as detailed below:[8]

### *JURISDICTION*

The jurisdictional analysis set forth within the Prior Opinion in relation to each of the claims asserted by the Plaintiffs pursuant to the Complaint is equally applicable to, and hereby adopted with respect to, each of the claims underlying the PI Application.

---

[4] *See* Docket Nos. 38 (the Benham Debtor's answer); 43 (Benham's answer, referred to herein as the "***Benham Answer***").

[5] *See* Docket Nos. 50 (Five Point Parties' trial brief) and 55 (Benham's trial brief).

[6] *See* Docket No. 54 (Proposed PI).

[7] The evidentiary record includes all of the testimony and documents introduced into evidence at the August 20, 21, and 22, 2024, TRO Application hearings in addition to all of the testimony and documents introduced into evidence at the September 26, October 11, and October 18, 2024, PI Application hearings.  With respect to exhibits, the parties confusingly elected to restart the numbering of their exhibits for the PI Application hearings instead of resuming with the numbering from the TRO Application hearings.  As a result, there is an overlap in the numbering of the exhibits.  Thus, to avoid confusion, any reference herein to an exhibit introduced into evidence at the TRO Application hearings will include a reference to "TRO" (*e.g.*, Plaintiffs' TRO Exh. 1, Defendants' TRO Exh. 1, etc.).  The PI Application exhibits referenced herein will omit any such "TRO" reference (*e.g.*, Plaintiffs' Exh. 1, Defendants' Exh. 1, etc.).

[8] To the extent any of the following findings of fact are more appropriately categorized as conclusions of law or include any conclusions of law, they should be deemed as such, and to the extent that any of the following conclusions of law are more appropriately categorized as findings of fact or include findings of fact, they should be deemed as such.

## ADDITIONAL FINDINGS OF FACT

The Court supplements the Factual Background of the Prior Opinion with the following additional findings:

### A.    Communications Leading Up to Execution of the Transactional Documents

In June 2019, a few months after the initial outreach of Lustig to Benham to present the possibility of a Five Point purchase of Benham's Practice, the parties signed a Letter of Intent to evidence their desire to move forward with such a transaction. Thereafter, the parties continued to exchange information in preparation for the sale and worked with their respective professionals on the transactional documents. From the start, Benham understood that a new Five Point dental support/service organization (DSO) – Benham SubCo – would be set up to acquire the Practice's assets, assume certain of the Practice's financial obligations, and handle the post-closing business operations of the Practice.[9] Benham further understood that, in conjunction with the sale, he would acquire a 49% ownership interest in Benham SubCo in exchange for the contribution of his Personal Goodwill in the Practice to Benham SubCo, and that a portion of the $5.0 million purchase price ascribed to the sale would be paid in-kind by way of the issuance of such 49% ownership interest.

As a new entity, Benham SubCo would require capital to close the transaction and have a beginning level of working capital. While some of the capital would come in the form of the contribution to be made by Five Point (through its wholly owned subsidiary FPDS Benham Holdco, LLC ("**Benham Holdco**"))[10] to acquire its 51% ownership interest in Benham SubCo,

---

[9] The business operations are to be distinguished from the clinical operations. Post-closing, the clinical operations of the Practice would remain with Benham Ortho.

[10] Effective May 26, 2021, Benham Holdco transferred its 51% ownership interest in Benham SubCo to Five Point. *See* Plaintiffs' Exh. 36 (Transfer and Assignment of Membership Interest, dated as of May 26, 2021, among Benham Holdco (as "Assignor"), Five Point (as "Assignee"), and Benham SubCo (as "Company")); *see also* Plaintiffs' Exhs. 33 (Benham SubCo written consent to transfer) and 35 (Five Point Joinder Agreement with respect to Benham SubCo Company Agreement (as defined below)).

Benham SubCo would require additional financing.  As the future owner of a 49% interest in Benham SubCo, Benham was naturally focused on when such financing would be paid off, thereby clearing the way for Benham SubCo to start making distributions to its equity owners, including Benham.[11]  Around the time of the LOI's execution in June 2019, Lustig informed Benham that Five Point was then-projecting a period of roughly three years for the financing (including accrued interest) to be paid off.[12]

Later, however, Five Point agreed to accommodate Benham's desire for a more immediate and definite "earnout" structure during the initial post-closing years of the relationship.  The earnout structure would serve to both incentivize Benham to grow the Benham Ortho Practice as well as provide certainty to Benham with respect to the timing and amount of early year disbursements from Benham SubCo in the event of successful growth.[13]  Importantly, the disbursement of such earnout payments, if and to the extent earned, would necessarily have an impact on when the initial financing would be paid off.

Prior to execution of the Transactional Documents and the closing of the sale on January 1, 2020, Five Point provided a funds flow/closing statement (the "*Closing Statement*") to Benham so that Benham could see how the agreed upon $5.0 million purchase price would be allocated/distributed at closing, how Benham SubCo would be capitalized, and how the respective amounts of Five Point's and Benham's initial contributions to Benham SubCo for their respective interests in the company were determined in relation to the $5.0 million value placed on the Practice.[14]  As evidenced by the Closing Statement, and as agreed to by the parties within the APA,

---

[11] *See, e.g.*, Plaintiffs' Exh. 1, at p.1 (text messages between Benham and Lustig with respect to the projected time frame for payoff of the financing).

[12] *See id*.

[13] *See* Prior Opinion, at pp. 13-14.

[14] *See* Plaintiffs' Exh. 14 (Closing Statement); Defendants' TRO Exh. 10 (same).

$1,334,782.47 of the $5.0 million purchase price was attributed to the value of the 49% ownership

interest in Benham SubCo to be issued to Benham. As further evidenced by the Closing Statement,

to enable Benham SubCo to fund the cash payments required to made at closing and to also obtain

starting working capital, Benham SubCo would obtain financing (a senior term loan) in the amount

of $2,773,945.[15] Benham clearly understood this and knew that such financing would be an

obligation that Benham SubCo would need to pay off.

**B.**    ***Additional Transactional Documents and Operational Agreements***

In addition to the Transactional Documents identified in the Prior Opinion, the following

additional transactional documents were executed in consummating the sale:

<u>Bill of Sale</u>. Benham Ortho and Benham (as the "Seller Parties") and Benham SubCo (as the "Buyer") executed a Bill of Sale, dated as of January 1, 2020 (the "***Bill of Sale***"), to memorialize Benham Ortho's and Benham's sale, assignment, transfer, conveyance, and delivery of the Purchased Assets (as defined in the APA) and all of their right, title and interest therein and thereto to Benham SubCo.[16]

<u>Assignment and Assumption Agreement</u>. Benham Ortho and Benham (as the "Assignors") and Benham SubCo (as the "Assignee") entered into an Assignment and Assumption Agreement, dated as of January 1, 2020 (the "***Assignment and Assumption Agreement***"), pursuant to which Benham Ortho and Benham assigned all of the Assigned Contracts (as defined in the APA) and all of their right, title and interest therein and thereto to Benham SubCo and Benham SubCo assumed all post-closing obligations under the Assigned Contracts along with certain trade accounts payable to third parties.[17]

<u>Rollover Agreement</u>: Benham SubCo and Behnam entered into a Rollover Agreement, dated as of January 1, 2020 (the "***Rollover Agreement***"), pursuant to which Benham agreed to contribute all of the Personal Goodwill (as defined in the APA) and all of his right, title and interest in and to the Personal Goodwill to Benham SubCo in exchange for Benham SubCo's issuance of the Rollover Units to Benham (*i.e.*, 490 units of Benham SubCo, representing a 49% membership interest in Benham SubCo).[18]

---

[15] *See id*.

[16] *See* Plaintiffs' Exh. 8 (Bill of Sale).

[17] *See* Plaintiffs' Exh. 7 (Assignment and Assumption Agreement).

[18] *See* Plaintiffs' Exh. 21 (Rollover Agreement) (*see also* Exh. B thereto (treating the contribution by Benham as having a value of $1,334,782.47)).

Separately, the following operational agreements were entered into to govern/manage the post-closing operation of Benham SubCo and Benham Ortho (collectively, the "***Operational Agreements***"):

> *Benham SubCo Company Agreement*.  Benham SubCo, Benham Holdco (as the holder of the Class B Common Units (voting)), and Benham (as the Initial Class A Holder (non-voting)) entered into an FPDS Benham Sub, LLC Amended and Restated Limited Liability Company Agreement, dated as of January 1, 2020 (the "***Benham SubCo Company Agreement***"), to memorialize how Benham SubCo would be managed and operated post-closing.[19]

> *The BSA*.  Benham SubCo (as the "Service Company"), Benham Ortho (as the "Dental Group"), and Lustig and Young (collectively, as the "Owner" of Benham Ortho) entered into a Business Services Agreement, dated as of January 1, 2020 (the "***BSA***"), to memorialize Benham Ortho's engagement of Benham SubCo as Benham Ortho's sole and exclusive provider of Business Services (as defined in the BSA).[20]

> *The BSA Subcontract*.  Benham SubCo (as the "Service Company") and Five Point (as the "Subcontractor") entered into a Business Services Subcontract, dated as of January 1, 2020 (the "***BSA Subcontract***"), pursuant to which Benham SubCo engaged Five Point to provide or arrange for certain Business Support Services [sic] (as defined in the BSA) with respect to Benham Ortho.[21]

Based upon the Operational Agreements, following the closing of the sale of Benham's Practice, the business operations of Benham Ortho[22] were managed and handled by employees of Benham SubCo and/or Five Point, as applicable (in the latter case, to the extent subcontracted to Five Point under the BSA Subcontract).

---

[19] *See* Plaintiffs' Exh. 5 (Benham SubCo Company Agreement); Defendants' Exh. 3 (same); *see also* Plaintiffs' Exh. 15 (Joinder Agreement executed by Benham to confirm his agreement to be bound to the terms and conditions of the Benham SubCo Company Agreement).

[20] *See* Plaintiffs' Exh. 9 (BSA); Defendants' Exh. 1 (same).

[21] *See* Plaintiffs' Exh. 10 (BSA Subcontract).

[22] The business operations are to be distinguished from the clinical operations.  Post-closing, the clinical operations of the Practice continued to be handled by and through Benham Ortho.

### C.    *Post-Closing/Pre-Firing Business Operations of Benham Ortho and Benham SubCo*

#### 1.    *Financial Reporting with Respect to Benham Ortho*

Based upon the terms of the BSA and BSA Subcontract, employees of Benham SubCo generally handled the day-to-day business operations of Benham Ortho, such as the payment of expenses, ordering of supplies, coordination with Orthofi on billings/payments under patient care payment plans, etc., while employees of Five Point handled higher level financial functions, such as the tracking of and reporting on Benham Ortho's financial performance and the evaluation and refinement of Benham Ortho's business/growth plan.  With that in mind, within a month of the closing, Five Point scheduled regularly monthly growth action plan (GAP) meetings with Benham to discuss the status of Benham Ortho's operations.  In conjunction therewith, Five Point provided to Benham monthly profit/loss statements, patient tracking information, patient service profit information, and goal statements on individual lines of business with respect to Benham Ortho.[23] Such information was also relevant to the determination of if and when Benham had successfully caused Benham Ortho to hit the EBIDTA targets necessary for Benham to become entitled to the payment of earnout amounts from Benham SubCo under the APA.

#### 2.    *Provision of Five Point Proprietary Materials to Benham Ortho*

Separately, Five Point provided certain proprietary materials to Benham Ortho employees to assist in the operation of the Benham Ortho clinics.  The types of materials provided included: (i) training materials for clinical employees; (ii) scripting for prospective patient calls and for the intake of new patients; (iii) "same day start" plan information; (iv) written materials for patients on how to take care of braces, how to wear rubber bands, etc.; (v) lab slips; (vi) materials on Five Point's Lifetime Retainer Program, including information with respect to marketing, fabrication,

---

[23] *See, e.g.*, Plaintiffs' Exh. 39, 43 and 50.

packaging, pricing and sales techniques; and (vii) information on various uses/means of using Orthofi to assist patients with the financing of their care (collectively, "***Five Point Proprietary Materials***").

  3.  <u>Impact of the COVID-19 Pandemic</u>

While everything was put in place at Benham SubCo and Benham Ortho to successfully get things off the ground within the Five Point system, the world changed in March 2020, just over two months after the closing.  First, on March 11, 2020, the World Health Organization declared the COVID-19 outbreak to be a worldwide pandemic.[24]  Thereafter, on March 13, 2020, the Governor of Texas issued a disaster proclamation on account of the COVID-19 outbreak and on March 22, 2020, issued an Executive Order temporarily banning elective medical procedures, including orthodontic procedures.[25]  Needless to say, the ban had a detrimental effect upon the entire Five Point network, including Benham Ortho, and Benham Ortho was forced to shut down for approximately six weeks.

To address the sudden inability to operate and the resulting drop in business, all of the doctors within the Five Point system were approached with the implementation of a pay reduction to keep the individual practices financially viable.  According to Lustig, Benham agreed to the reduction, resulting in Benham receiving roughly $18,000 less in 2020 than as provided for in his Employment Agreement.  According to Benham, the reduction was implemented by management without any real meaningful opportunity to oppose it.  He now asserts that he never agreed to a *permanent* waiver or release of the amount of his salary that was not paid in 2020.  Even so,

---

[24]  *See* World Health Organization Overview of Coronavirus disease (COVID-19) pandemic (https://www.who.int/europe/emergencies/situations/covid-19).

[25] *See* Texas Governor Executive Order GA 09 (Mar. 22, 2020) (viewable at https://gov.texas.gov/news/post/governor-abbott-issues-executive-order-increasing-hospital-capacity-announces-supply-chain-strike-force-for-covid-19-response).

Benham never complained about the nonpayment of the 2020 reduction until after his termination from Benham Ortho in February 2024.

### 4.  *The Delay in Benham SubCo Financial Reporting and The Eventual Breakdown of the Parties' Relationship*

The source of friction that ultimately led to the irreversible breakdown in Benham's and the Five Point Parties' business relationship was the lack of timely reporting on Benham SubCo's financial situation and missed expectations on the part of Benham with respect to the payoff of Benham SubCo debt and the amount and timing of Benham SubCo distributions.  In this regard, while, to date, Benham has never been entitled to *receive* an equity distribution from Benham SubCo, given the five-year holding period established under the Benham SubCo Company Agreement,[26] he has nevertheless been entitled to the accrual of earned but undisbursed distributions (plus a preferred return right equivalent to interest at the rate of 6.5% per annum, compounded annually, on the balance of such earned but undisbursed distributions) (collectively, the "**Deferred Cash Distributions**").[27]  As a result, Benham has been keenly focused on the status of Benham SubCo's payoff of the financing, the overall profitability of Benham SubCo, and what Benham SubCo has been doing with any realized profits, particularly any profits allocable to Benham as Deferred Cash Distributions.

In mid-November 2021, following nearly a two-year period during which Benham had not been provided any meaningful information with respect to the above matters, Benham sent a letter to Five Point on behalf of himself and certain other similarly-situated orthodontists to raise concerns.[28]  Among other things, he inquired into how each practice's debt was being paid down,

---

[26] *See* Benham SubCo Company Agreement § 3.2 (providing for five-year Distribution Holding Period).

[27] *See id*. § 3.3(a)-(b) (distribution and holding period provisions) and attached Exh. A (providing applicable definitions).

[28] *See* Defendants' Exh. 29.

how the DSO entities (Benham SubCo in Benham's case) were using the undisbursed earned distributions of the doctors (*i.e.*, the Deferred Cash Distributions in Benham's case), and what the practices were receiving in exchange for the 6% management fee being charged by Five Point.[29] While it appears that Five Point responded to certain of the inquiries, it is unclear when and in what regard.

Later, in advance of the June 2022 monthly GAP meeting for Benham Ortho, Benham again requested an update with respect to the outstanding unpaid debt at Benham SubCo.[30] On July 26, 2022, a month later, Janet Bradshaw ("**Bradshaw**"), Five Point's Chief Financial Officer, responded to the inquiry, explaining that she was just then getting around to reporting on each practice's debt. In doing so, she confirmed that "[t]his type report has not been created before."[31]

By late September 2022, the promised report had still not been provided to Benham. This presented a situational problem for Benham because he was in the midst of applying for a $4.0-5.0 million loan for a cabin construction project and needed the information to provide to his lender.[32] On September 27, 2022, Bradshaw reported to Benham that Five Point had just completed an earnings workbook for one of the other orthodontists, but that his had not yet been started. She indicated that they would be getting to his next and expected to provide it by October 15, 2022. She additionally reported that, going forward, Five Point intended to provide an updated report twice per year – on April 15th and October 15th of each year.[33]

While it appears that the initial report was eventually provided to Benham, the next report planned for April 2023 was not. On July 3, 2023, over two months after the end of the April 15th

---

[29] *See id.* (attached letter, at p.1 ¶ 1 and p.2 ¶ 5).

[30] *See* Plaintiffs' Exh. 46 (6/23/2022 internal Five Point correspondence with respect to Benham inquiry).

[31] *See id.* (7/26/2022 correspondence from Bradshaw to Benham).

[32] *See* Plaintiffs' Exh. 49 (9/26/2022 correspondence from Benham to Bradshaw).

[33] *See id.* (9/27/2022 correspondence).

promised reporting period, Benham sent an email to Bradshaw to inquire about the status.[34]  When

no response came, Benham sent a follow-up inquiry on July 12, 2023.[35]  This time Bradshaw

responded, indicating that an updated undistributed earnings report would be provided at the end

of July 2023.  Her response seemingly suggested that the previously planned reporting dates of

April 15th and October 15th would be scrapped in favor of a single annual report at the end of each

July.[36]  Later, in August or September 2023, Lustig and Young called Benham to inform him that

they did not know when the Five Point recap would be completed.  More concerning, it appears

that they also reported that the five-year period originally projected for the monetization of the

value of Benham SubCo was becoming questionable.  The news was distressing to Benham.

In fact, with the final year of the initial five-year term of Benham's Employment

Agreement, the Frisco Location Lease, and the McKinney Location Lease set to expire at the end

of 2024, Lustig and Young raised the possibility of a renewal of the agreements for another five-

year term.  That was a non-starter for Benham who, among other things, had incurred debt in

connection with his cabin construction project under the belief that he would be able to start

monetizing his interest in Beham SubCo by the end of the initial five-year term.

Thereafter, Benham only became increasingly skeptical of the Five Point Parties'

intentions.  Thus, he began to map out an alternative proposal to present to Five Point.  In

formulating the proposal, it appears that Benham felt confident about his ability to demand

monetary concessions given that he was (and had been) the only practicing orthodontist at Benham

Ortho – making him indispensable to Benham Ortho's ongoing operations – and given that the

Frisco and McKinney clinic locations were leased from BPOA – a Benham-controlled entity.

---

[34] *See* Plaintiffs' Exh. 66 (7/3/2023 correspondence from Benham to Bradshaw).

[35] *See id*. (7/12/2023 correspondence from Benham to Bradshaw).

[36] *See id*. (7/12/2023 correspondence from Bradshaw to Benham).

Aware of Benham's frustration and financial situation with respect to the cabin construction project, Five Point also went to work on developing a proposal that could provide Benham with some increased income by way of a reconfiguration of certain aspects of the existing agreements.

In early January 2024, Lustig and Young had a follow-up call with Benham to present the terms of a proposed memorandum of understanding outlining Five Point's proposal. The terms of the MOU were nowhere close to meeting Benham's expectations. As a result, Benham became quite explosive, threatening to proverbially burn down the Benham Ortho practice and take some of the other Five Point doctors with him. In relation to existing patients, he suggested that he would just simply take a period of medical leave, thereby causing the practice to be left with no other orthodontist to service the patients. Trying to calm the situation, Lustig suggested to Benham that he discuss his concerns with Samuel Hines ("**Hines**") and Jared Rochwerg ("**Rochwerg**") of Casla Partners, one of Five Point's key investors. Benham agreed to do so.

Accordingly, on January 19, 2024, Benham visited with Hines and Rochwerg. At that time, Benham presented his own proposal: Five Point could either (1) undertake an immediate buy-out of Benham's interest in Benham SubCo for $5.0 million, or (2) revise the Benham SubCo Company Agreement to permit an immediate sale of Benham's entire 49% interest in Benham SubCo upon an FPDS Liquidity Event (as defined in the Benham SubCo Company Agreement) (which, notably, would also trigger a required immediate payout of the Deferred Cash Distributions).[37] While Benham originally demanded a response by Five Point by no later than January 24, 2024, he later agreed to an extension through January 31, 2024.

On Wednesday, January 31, 2024, Hines delivered Five Point's response. Noting, first, that Five Point had become aware of Benham's efforts "to disparage [Five Point] and to interfere

---

[37] *See* Plaintiffs' Exh. 76, at pp.2-3 (1/20/2024 correspondence from Hines to Benham confirming options presented by Benham during the 1/19/2024 call); *see also* Benham SubCo Company Agreement §§ 6.1 and 6.7.

with [Five Point's] business and contractual relationships with [Five Point] doctors by spreading misinformation and attempting to induce them to breach their agreements," Hines stated that, subject to Benham's confirmation in writing that he would cease and desist from any further disparaging conduct, Five Point was "willing to engage in good faith negotiations with [Benham] to amicably conclude [their] relationship including the purchase of [Benham's] remaining equity in [Benham SubCo]."[38]   Hines made it clear to Benham, however, that Five Point was rejecting Benham's proposed $5.0 million purchase price for Benham's 49% interest, asserting that there was no financial basis for such an amount.   In relation to Benham's disparaging comments, Five Point demanded that Benham provide a response to the cease-and-desist demand by February 2, 2024.[39]

The following day, on Thursday, February 1, 2024, Benham did not show up to work. Instead, he contacted personnel at the Benham Ortho offices to (mis)inform them that he had been instructed by Five Point to permanently discontinue providing services under his Employment Agreement.   While that was obviously not true, it resulted in the cancelation of patient appointments.   When Five Point and the management of Benham Ortho learned of these developments, a decision was made for Benham Ortho to fire Benham.   Accordingly, the Termination Letter was sent to Benham shortly thereafter, pursuant to which Benham's employment with Benham Ortho was terminated, effective immediately.[40]

---

[38] *See* Plaintiffs' Exh. 76, at p.1.

[39] *See id*., at pp.1-2.

[40] *See* Plaintiffs' Exh. 77 (Termination Letter).  Late in the day, Benham sent a follow-up text to Lustig and Young in an apparent effort to cause them to walk back the Termination Letter, claiming that his absence from the office was caused by a medical condition and that he would be pursuing medical leave.  *See* Plaintiffs' Exh. 78, at p.1 (4:12 p.m. text from Benham to Lustig and Young).  No action was taken by Benham Ortho in response to the text.

### D.        *The Post-Firing Operation of Benham Ortho*

In February 2024, following Benham's termination, Five Point/Benham Ortho hired Dr. Jason Cope ("*Cope*") on a provisional basis to immediately begin providing orthodontic services to Benham Ortho patients.   During this time frame, while employees of Benham Ortho were confused by the conflicting stories that they were hearing from Benham and Five Point with respect to Benham's employment status, no patient complaints were received with respect to the quality of care being rendered and no patient transfer requests were presented.  At the end of March 2024, Five Point/Benham Ortho also hired Dr. Lauren Flynn ("*Flynn*") with the intent of having her take over the orthodontic services at the Frisco Location.   Flynn is an orthodontist who was then-working in Louisiana.  Because she and her family would need time to relocate to the Dallas/Frisco area, her start date was slated for the end of May 2024.

On April 29, 2024, prior to Flynn's start date, Benham commenced litigation against the Five Point Parties and obtained the State Court's issuance of the Benham TRO.  Then, with the Benham TRO in hand, Benham returned to the Benham Ortho offices and, upon arriving, informed Cope that his services were no longer needed and that he should leave.  At the time, Benham was obviously not authorized to make any employment decisions on behalf of Benham Ortho.  In fact, Benham had already organized the Benham Debtor as the new entity through which he would practice and had caused, or was about to cause, BPOA to enter into a new set of leases with the Benham Debtor, both effective as of April 29, 2024, for the Benham Debtor's purported lease of the same Frisco and McKinney Locations that had already been leased by BPOA to Five Star for the benefit of Benham Ortho.[41]   Nevertheless, not knowing any better, Cope complied with the Benham directive and ended up never returning to Benham Otho.

---

[41] *See* Plaintiffs' TRO Exh. 2G (Certificate of Formation of the Benham Debtor); Plaintiffs' Exhs. 85 and 86 (new leases with the Benham Debtor).

The existence of the Benham TRO and Benham's actions with respect to Cope had the effect of also complicating Flynn's start date. While Flynn successfully relocated to the Dallas/Frisco area in May 2024, believing that she would be starting at Benham Ortho Frisco Location at the end of May, the uncertainty and instability at the Benham Ortho offices caused Five Point/Benham Ortho to instruct Flynn to not go to the Frisco office at the end of May. Thus, she was effectively left in an awkward holding pattern.

Ultimately, the state of affairs at Benham Ortho remained muddied until at least June 27, 2024, due to the conflicting TROs issued by the State Court.[42] While the Benham TRO precluded the Five Point Parties from interfering with Benham's treatment of patients at the Frisco and McKinney Locations, the First Five Point TRO and Second Five Point TRO precluded Benham from entering or coming within 100 yards of or on the leased premises at those two locations.[43] During this period of uncertainty, Benham encouraged Benham Ortho patients to transfer to his new practice with the Benham Debtor, enlisting the assistance of, among other individuals, Aubrey Meier ("*Meier*"), one of Benham's long-time, loyal employees at Benham Ortho. According to Meier, stating in early May 2024, patients were provided information on how to transfer to the Benham Debtor.

On June 27, 2024, the uncertainty was finally resolved – or so the Five Point Parties thought. On that date, Benham's request for conversion of the Benham TRO into a preliminary injunction was denied by the State Court and the Five Point Parties' request for conversion of the Second Five Point TRO into a preliminary injunction was granted, at least in part. Both the Original Temporary Injunction and the later Amended Temporary Injunction continued to enjoin

---

[42] Curiously, notwithstanding their conflicting terms, the parties agreed to an extension of both the Benham TRO and the Five Point TROs during this time frame.

[43] *See* Defendants' TRO Exh. 16; Plaintiffs' TRO Exhs. 2H and 21.

Benham from entering or coming within 100 yards of the leased premises at the Frisco and McKinney Locations.[44]

Faced with these developments, in the case of the Frisco Location, Benham determined to simply skirt the 100-yard prohibition by having loyal Benham Ortho employees walk Benham Ortho patients down to a martial arts studio (Tiger Rock Martial Arts) within the same shopping center as the Benham Ortho Frisco Location, where Benham would then treat them. Thereafter, Benham obtained space within a nearby Sea of Smiles office, at which point a sign was posted on the front door of Benham Ortho's Frisco Location to redirect Benham Ortho patients to Sea of Smiles.[45] At or around this time, Five Point also discovered that certain of Benham Ortho's equipment and supplies had been moved to Sea of Smiles. While the Five Point Parties successfully obtained the Supplemental Five Point TRO to address the removed property,[46] it was clear that Benham was going to continue to take actions designed to negatively impact the ability of Benham Ortho to treat patients at the Benham Ortho Frisco and McKinney Locations.

Even so, eventually Five Point/Benham Ortho regained control of the Frisco Location, thereby enabling Flynn to start seeing patients there by the end of July 2024. Ultimately, she would end up working there for only a period of roughly four to six weeks. During that time, she found it challenging to treat patients due to the lack of adequate equipment and supplies – equipment and supplies that had been removed by or at the direction of Benham.

---

[44] *See* Plaintiffs' TRO Exhs. 2J (Original Temporary Injunction) and 2L (Amended Temporary Injunction).

[45] *See* Plaintiffs' Exh. 117, at p.1.

[46] As explained in the Prior Opinion, Benham never took any action to cause any of the removed property to be returned to Benham Ortho. Instead, Five Point was forced to independently take action to recover whatever property at Sea of Smiles could be traced back to Benham Ortho. To date, there are still items of property that have never been returned to Benham Ortho. In this regard, Meier acknowledged at trial that the Benham Debtor has possession of certain binders of information, including Five Point Proprietary Materials.

At the end of July 2024, Benham again moved to a new location – this time to the Colleyville, Texas office of Pediatric Dentistry of Colleyville ("**PDC**").  As a result of the move, Benham and his staff again launched an informational campaign targeted at Benham Ortho patients to inform them of the move and to persist in their efforts to woo patients away from Benham Ortho. Indeed, during the short time that Flynn worked at the Frisco Location, Benham Ortho received roughly 2-3 patient transfer requests per day.

On August 27, 2024, this Court entered the Prior Opinion and Adversary TRO.  Undeterred by the Adversary TRO (and the existing Amended Temporary Injunction issued by the State Court), Benham continued to disrupt Benham Ortho operations.  On August 28 or 29, 2024, for example, Benham caused Benham Ortho employees to be locked out of the Frisco Location. Benham also continued to solicit Benham Ortho patient transfers and to provide information to patients on how to request refunds on Orthofi financed plans.[47]  All in all, since late June 2024, Benham Ortho has received at least 200 transfer requests from patients purportedly desiring to transfer their treatment to the Benham Debtor.  Additionally, hundreds of patients have submitted refund requests with respect to their Orthofi plans.

**E.**     ***Five Point Pivots to Frisco Star***

Benham's persistence in obstructing Benham Ortho's retention and treatment of patients proved to be the final straw in causing Five Point to implement an alternate strategy.  In July 2024, Five Point organized FPDS FSO, PLLC ("***Frisco Star***") for the purpose of acquiring another practice in the Frisco area within two miles of the Benham Ortho Frisco Location that could then

---

[47] *See, e.g.*, Plaintiffs' Exhs. 113 (text message to Benham Ortho patients informing them of the transition of Benham's practice to Colleyville and providing them with contact information for purposes of obtaining patient transfer paperwork) and 114 (listing of patients to whom the text message was sent).

provide services to the Benham Ortho patients.[48]  The new practice would operate under the name "Frisco Star Orthodontics."[49]

In early September 2024, Flynn moved to Frisco Star and Five Point began to notify all remaining Benham Ortho patients of the practice change.[50]  As a result, by September 2024, both Five Point/Frisco Star and Benham/the Benham Debtor were actively soliciting remaining Benham Ortho patients to transfer away from Benham Ortho to Frisco Star or the Benham Debtor, as applicable.  Moreover, for those who ultimately received care at Frisco Star, Benham even encouraged those patients to transfer to the Benham Debtor.[51]

As a result of all of this jockeying, Benham Ortho is no longer treating *any* patients.  In fact, as acknowledged by Young, Benham Ortho is no longer even in a position to treat any patients, having no equipment on site, and there is no plan on the part of Five Point/Benham Ortho to restart any Benham Ortho operations.

### *ANALYSIS OF RELIEF SOUGHT PURSUANT TO PI APPLICATION*

**A.     *Standard Applicable to the Provision of Preliminary Injunctive Relief***

For each underlying claim that is properly before the Court, to obtain pretrial preliminary injunctive relief in relation thereto, the Plaintiffs must establish each of the following (collectively, the "***PI Elements***"): (1) there is a substantial likelihood that they will prevail on the merits of such claim; (2) there is a substantial threat that irreparable harm will result to the Plaintiffs if the

---

[48] *See* Defendants' Exh. 6 (Certificate of Formation of Frisco Star).

[49] *See* Defendants' Exh. 7 (Assumed Name Certificate, reserving the name "Frisco Star Orthodontics" for use by Frisco Star in conducting business).

[50] Imprudently, Five Point also simultaneously directed that certain of the remaining Benham Ortho equipment and supplies be moved to Frisco Star, including an iTero scanner, an Autoclave sterilizer, a treatment chair, and some Apple computers.  Such items were later removed from the Frisco Star location and placed into storage, but not until Benham raised the issue in pleadings in advance of a hearing in late September 2024.

[51] *See, e.g.*, Plaintiffs' Exh. 112 (flyer developed by Meier at the direction of Benham to provide information to patients on how to transfer to Benham and seek a refund from Frisco Star).

injunction is not granted; (3) the threatened injury to the Plaintiffs outweighs the threatened harm to the Targeted Defendant(s) sought to be enjoined; and (4) the granting of injunctive relief will not disserve the public interest.[52]

### B.     Benham's Initial Defensive Argument of Unclean Hands

Before turning to the specific injunctive relief sought by the Plaintiffs and the underlying claims upon which the relief is predicated, the Court considers Benham's defensive argument of unclean hands.  The United States Supreme Court has explained that "the equitable maxim that 'he who comes into equity must come with clean hands'" "necessarily gives wide range to the equity court's use of discretion in refusing to aid the unclean litigant."[53]  With this in mind, Benham argues that none of the injunctive relief sought by the Plaintiffs against him should be provided because the Plaintiffs have allegedly come to court with unclean hands in the following two ways: (1) while the Plaintiffs, who are directly or indirectly controlled by Lustig and Young, seek to enforce restrictive covenants of the APA and Employment Agreement against Benham to prevent competitive conduct that would allegedly harm Benham SubCo and Benham Ortho, Lustig and Young are simultaneously engaged in the same type of conduct by and through Frisco Star that is allegedly precluded by restrictive covenants of the BSA; and (2) in pursuing and obtaining the Adversary TRO, the Plaintiffs falsely represented to the Court that Benham had been paid all salary that had come due under the Employment Agreement.   Each of these arguments is considered in turn.

---

[52] *See Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987); *see also Denton v. City of El Paso, Texas*, 861 Fed. Appx. 836, 838 (5th Cir. 2021) (quoting *Moore v. Brown*, 868 F.3d 398, 402-03 (5th Cir. 2017)).

[53] *Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.*, 324 U.S. 806, 814-15 (1945); *see also Coastal Corp. v. Texas E. Corp.*, 869 F.2d 817, 821-22 (5th Cir. 1989) (finding grounds to vacate a preliminary injunction based upon the applicant's unclean hands in obtaining it).

### *(1) The BSA Argument*

First, to set the stage for Benham's BSA argument, it is important to understand Lustig's and Young's connections to Benham Ortho, Benham SubCo, Five Point, and Frisco Star.  In the case of Benham Ortho, since the time of the closing of the APA sale on January 1, 2020, Lustig and Young have been the sole owners of Benham Ortho and, thus, Benham Ortho has been under their direct control.[54]  In the case of Benham SubCo, since May 26, 2021, the sole manager of Benham SubCo has been Five Point,[55] and since the time of the APA sale closing on January 1, 2020, Lustig has been involved in the management of Five Point, serving as its President and Chief Executive Officer, and Lustig and Young have been members of the Five Point board.[56]  Finally, in the case of Frisco Star, since the time of Frisco Star's organization on July 10, 2024, Lustig and Young have served as its managers.[57]  Thus, clearly Lustig and Young hold positions of control in relation to all four entities – Benham Ortho, Beham SubCo, Five Star, and Frisco Star.

Next, it is important to understand the purpose of the BSA.  Pursuant to the terms of the BSA, Benham SubCo agreed to provide Business Services (*i.e.*, certain non-clinical business and administrative services) to Benham Ortho and Benham Ortho agreed to engage Benham SubCo as its exclusive provider of such Business Services for a period of 20 years (unless earlier terminated in accordance with the agreement).[58]  As part of the agreement, Lustig and Young, as parties to

---

[54] *See* Plaintiffs' TRO Exh. 2BB (Share Transfer Agreement pursuant to which Benham sold 100% of his equity ownership in Benham Ortho to Lustig and Young, effective January 1, 2020); *see also, e.g.*, Plaintiffs' Exhs. 26 (written consent of sole director and shareholder of Benham Ortho appointing Lustig as President and Chief Executive Officer of Benham Ortho) and 4 (letter of resignation pursuant to which Benham resigned from all of his positions as an officer and director of Benham Ortho upon the APA sale's closing).

[55] *See* Plaintiffs' Exh. 33 (written consent of voting member and then-manager of Benham SubCo to such appointment).

[56] *See, e.g.*, Plaintiffs' Exhs. 10 (BSA Subcontract signed by Lustig as Five Point President and CEO) and 12 (Escrow Agreement signed by Lustig as Five Point President and CEO).

[57] *See* Defendants' Exh. 6 (Certificate of Formation of Frisco Star, Article Three).

[58] *See* BSA Recital ¶ B and §§ 1.1 and 5.1.

the agreement, acknowledged that Benham SubCo had "invested a great deal of resources, time, experience, and money in the development of its business model;" consequently, "in order to protect its trade secrets and other legitimate business interests" they agreed to the restrictions set forth within the negative covenants of § 8.1 of the BSA during the term of the agreement and for a period of two years following any termination or expiration of the agreement.[59]   Among the agreed upon restrictions is that Lustig and Young will not "in any manner, directly or indirectly (whether as an owner, partner, agent, consultant, co-venturer, equity holder, manager, employee, officer, director, consultant, independent contractor, agent, advisor, lender or investor, or in any other manner or capacity), individually or in conjunction with or on behalf of any other Person … engage or participate in the provision of management, business, marketing or other support services to any dentist, orthodontist, dental or orthodontic practice or entity or other Person providing dental or orthodontic services or products of dental services, in each case anywhere within a radius extending thirty five (35) miles in each direction from each Office location [*i.e.*, the Frisco and McKinney Locations] or any other dental office or location at which [Benham SubCo] provides any non-clinical business administrative services."[60]

With that backdrop, Benham argues that the Five Point Parties, who are owned and/or controlled by Lustig and Young, are disingenuously pursuing the pretrial enforcement of contractual restrictions against Benham with respect to where he can and cannot engage in the management of his practice while at the same time allegedly violating the same type of restrictions in § 8.1 of the BSA in operating and managing Frisco Star which is located within 35 miles of Benham Ortho's Frisco Location.   Viscerally, this argument would appear to have merit.   The

---

[59] *See* BSA § 8.1.

[60] *See* BSA § 8.1(d).

Plaintiffs, however, assert that other terms of the BSA exempt Lustig and Young from the restrictions of BSA § 8.1.  Having reviewed such other terms, the Court agrees.

Specifically, § 1.1 of the BSA provides that "[n]o provision of this Agreement will or is intended to limit the right, authority or ability of [Benham SubCo] *or its Affiliates* to contract with or provide services to any other dental or orthodontic practice, dentist, orthodontist or other Person."[61]  For purposes of this provision, an "Affiliate" of Benham SubCo includes (a) each Person which directly or indirectly, through one or more intermediaries, controls Benham SubCo, (b) each Person which beneficially owns or holds 10% or more of the voting equity interests of Benham SubCo, and (c) each Person which directly or indirectly, through one or more intermediaries, is under common control with Benham SubCo.[62]  "Control" is defined as "the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities[,] by contract[,] or otherwise."[63]  Based upon the foregoing definitions, Lustig and Young are Affiliates of Benham SubCo given their direct or indirect control of Benham SubCo.[64]  Thus, Lustig's and Young's actions in relation to Frisco Star and Benham SubCo are excepted from the restrictions set forth within § 8.1 of the BSA.

As explained by Lustig, the § 8.1 restrictions were and are designed to protect Benham SubCo and Benham Ortho against any interference from those who are not (or are no longer)

---

[61] *See* BSA § 1.1 (emphasis added).

[62] *See* BSA Exh. A (definition of "Affiliate").

[63] *See* BSA Exh. A (definition of "Control").

[64] Additionally, Five Point is an Affiliate of Benham SubCo based upon its ownership of at least 10% of the voting equity interests in Benham SubCo and Frisco Star is an Affiliate of Benham SubCo based upon the fact both Frisco Star and Benham SubCo are directly or indirectly under the common control of Five Point (and Lustig and Young, as Five Point officers and board members).

integrally connected to the Five Point system.[65]   In the case of those who remain integrally connected to the Five Point system (such as the Five Point Parties and Lustig and Young), the restrictions are inapplicable as unnecessary.   Moreover, it is worth note that, here, the pivot by Five Point (through Lustig and Young) to Frisco Star was brought about by Benham's own continuing interference with the operations of Benham Ortho.

In short, the Court finds insufficient grounds to preclude consideration of the PI Application on the basis of the argument that Lustig's and Young's actions violate the restrictions of BSA § 8.1.

### (2) The Salary Argument

Turning to Benham's salary argument, Benham is correct in his assertion that the Five Point Parties presented evidence during the TRO Application hearings that Benham had been paid the full amount of his salary through the date of the termination of his employment with Benham Ortho.   Not until the hearings on the PI Application was there any revelation about the reduction in pay implemented in 2020.   Benham claims that the Plaintiffs intentionally misrepresented the facts to overcome Benham's prior breach-excused performance affirmative defense.[66]   The Plaintiffs dispute such contention, asserting that Benham agreed to the temporary salary reduction and, hence, was in fact paid the full amount of his salary after taking into account the agreed-upon reduction.

Ultimately, the Court finds that both the Plaintiffs and the Defendants were, for whatever reasons, strategically opaque in the presentment of salary evidence and arguments during the TRO

---

[65] The Court additionally notes that, under the terms of the BSA, the BSA parties (*i.e.*, Benham SubCo, Benham Ortho, Lustig and Young) entered into the agreement for their own benefit with the intention that nothing within the agreement or in the parties' subsequent course of dealings was to be construed as conferring any third party beneficiary rights or status on any person not a party to the agreement.  *See* BSA § 9.6 (last sentence).

[66] *See* Benham Answer, at p.7 (¶ 2 of affirmative defenses); *see also* Prior Opinion, at p.38 (discussion of affirmative defense of prior material breach).

Application hearings.  Most notably and surprisingly, neither side mentioned a word about the

COVID-19 pandemic and the resulting implementation of a salary reduction.  Instead, the Court

was baldly informed that all of the salary had been paid (per the Plaintiffs) or not paid (per the

Defendants).  Nevertheless, having now heard more about what was going on in the background

at the time, the Court finds insufficient grounds to preclude consideration of the PI Application on

unclean hands grounds.  This is not to say that Benham will ultimately fail to establish his breach

of contract claim for unpaid salary.  It is to simply note that application of the unclean hands

doctrine is not warranted in the face of a bona fide salary dispute.

## C.      *Evaluation of Right to Injunctive Relief*

The Court now considers the specific requests for injunctive relief requested by the

Plaintiffs and the individual claims upon which each such request has been predicated.

### 1.      *Orthodontic Practice Management Limitations*

Plaintiffs first request that the Targeted Defendants be enjoined and prohibited from taking

the following action:

> *Providing management, business, marketing, or other support services to any*
> *orthodontic or related practice anywhere within a twenty (20) mile radius*
> *extending in all directions from any practice operated by [Five Point] in Texas,*
> *including but not limited to the Frisco and McKinney Locations.*[67]

The Plaintiffs predicate such relief on the following counts within the Complaint: Count 3 (claim

of Five Point against Benham for breach of the APA); Count 4 (claim of Benham Ortho against

Benham for breach of the Employment Agreement); Count 5 (claim of the Five Point Parties

against Benham and the Benham Debtor for tortious interference with the Five Point Parties'

existing and prospective contracts and business relationships with clients and customers); and

Count 6 (claim of the Five Point Parties against the Benham Debtor for tortious interference with

---

[67] *See* Proposed PI ¶ 1.

the Five Point Parties' existing contracts with Benham).  Each of these claims is considered in

turn.

### Counts 3: Breach of the APA

In relation to Count 3 of the Complaint,[68] Plaintiffs appear to tie their request for injunctive

relief to § 7.2(a)(B) of the APA which precludes Benham from taking the following action during

the APA Restricted Period:[69]

> [P]roviding management, business, marketing or other support services to any
> orthodontic, corrective aligner or dental practice ... anywhere within a twenty (20)
> miles radius extending in all directions from the location of each location at which
> [Five Point] [is] then operating or, to [Benham's] knowledge, [has] taken
> affirmative steps to begin operating at any time during the Restricted Period prior
> to such prohibited action....[70]

Having considered such contractual language and the evidentiary record before the Court, the

Court finds that the Plaintiffs have failed to satisfy the first, second, and third PI Elements in

relation to the injunctive relief sought.

First, with respect to substantial likelihood of success, it is certainly clear that since April

29, 2024, Benham has been providing management, business, marketing and other support services

to the Benham Debtor.  And it is also clear that at all times (or substantially all times), the Benham

Debtor has operated within 20 miles of the location of a practice that is being operated by Five

Point.[71]  Currently, the Benham Debtor's base of operations at the PDC office in Colleyville, Texas

is within 20 miles of Hashem Orthodontics, a practice in Colleyville, Texas operated by Five

Point.[72]  Notwithstanding the foregoing, pursuant to the Benham Answer, Benham has asserted (as

---

[68] *See* Prior Opinion, at p.32 & n.77 (detailing the elements of a breach of contract claim in relation to the APA).

[69] *See* Prior Opinion, at p.15 & n.41 (detailing length of APA Restricted Period).

[70] *See* Plaintiffs' Exh. 6 (APA) § 7.2(a)(B).

[71] *See* Plaintiffs' Exh. 115 (map and listing of practices operated by Five Point in the Dallas-Fort Worth area).

[72] *See id*.

an affirmative defense) that his actions were and are fully justified,[73] thereby implicitly challenging the enforceability of the non-compete provisions of § 7.2(a)(B).

As explained in the Prior Opinion, to be enforceable under Delaware law,[74] a covenant not to compete must be reasonable in scope and duration, both geographically and temporally, and the covenant must advance a legitimate economic interest of the party enforcing the covenant.[75]  With that in mind, and picking up on the discussion included within the Prior Opinion on the enforceability of § 7.2(a)(B),[76] the Court fails to see how precluding Benham from performing business-related services for *his own orthodontic practice through his own entity* advances any legitimate economic interest of Five Point.  Importantly, the Courts notes that no evidence was presented of Benham's provision of any such business-related support services to any practice or entity other than his own orthodontic practice through the Benham Debtor.

Initially, it is undisputed that nothing within the APA precludes Benham from providing orthodontic services to patients at the PDC location.[77]  Instead, the focus is on management, and as to management, the Plaintiffs assert that Benham is contractually barred from managing his own practice at such location.  In fact, according to the Plaintiffs, Benham's only option is to work for someone else if he is going to work within 20 miles of *any* practice managed by Five Point.  Such a limitation does not appear to further any legitimate interest of Five Point; instead, its enforcement appears to be punitive in nature.

---

[73] *See* Benham Answer, at p.7 (Defenses ¶ 5).

[74] *See* APA § 8.6 (providing for the APA to be governed by and construed in accordance with the laws of the Stae of Delaware).

[75] *See* Prior Opinion, at p.33.

[76] *See* Prior Opinion, at pp.34-35.

[77] *See* APA § 7.2(a)(A) (limiting prohibition against competitive practice of orthodontic care to within 20 miles of the Frisco and McKinney Locations).  The PDC Colleyville office is outside of the 20-mile prohibition zone of APA § 7.2(a)(A).

Again, the only practice/entity to which Benham has provided any business-related services since his termination from Benham Ortho has been his own practice through the Benham Debtor.  Five Point cannot seriously be suggesting that Benham's actions in managing his own practice is, in some way, depriving Five Point and its affiliates of a business opportunity. Realistically, there is a zero percent chance of the Benham Debtor ever employing Five Point to do anything.  At a minimum, at this juncture the Court is not prepared to find that Five Point is *substantially* likely to succeed on its breach of contract claim under § 7.2(a)(B).

Second, with respect to a substantial threat of irreparable harm, for the same reasons as outlined above, the Court finds no such threat given that Benham is, and only has, managed his own practice/entity.  He is not attempting to compete with Five Point in managing other practices. Perhaps appreciating this, counsel for the Plaintiffs argued at trial that the enforcement of § 7.2(a)(B) against Benham is allegedly necessary to prevent the competitive harm to Five Point of Benham's unauthorized use and/or disclosure of proprietary and confidential information of the Five Point Parties.  But the Amended Temporary Injunction of the State Court (which remains in full force and effect) already enjoins such conduct.[78]  In short, there has not been a sufficient showing of a substantial threat of irreparable harm to the Plaintiffs if Benham is not enjoined from providing business-related services to his own entity, the Benham Debtor.

Finally, even if there were some nominal threat of injury to Five Point from Benham managing his own practice at the PDC location, the Plaintiffs have failed to adequately show that such injury outweighs the threatened harm to Benham if he is enjoined.  Among other things, no evidence was presented of any orthodontic practice in and around the same DFW area that is currently hiring orthodontists, much less an orthodontist like Benham who is in the middle of a

---

[78] *See* Amended Temporary Injunction ¶¶ a & c.

messy business divorce.  In fact, if anything, the Plaintiffs have successfully demonstrated that they have largely cornered the market in and around the area where Benham wishes to work.[79] Thus, a real risk exists that if Benham is enjoined as requested, he may not be able to work at all, which is a risk that outweighs the risk of harm to Plaintiffs if Benham is not enjoined.

### Count 4: Breach of the Employment Agreement

Next, in relation to Count 4 of the Complaint, Plaintiffs tie their request for injunctive relief to § 4.2(a) of the Employment Agreement which provides that, during the EA Restricted Period,[80] Benham shall not, directly or indirectly, have any involvement with any entity or individual (referred to as a "Competing Business" in § 4.2(a)) engaged in, or attempting or planning to become engaged or involved in, providing management, business, administrative, marketing or other support services to any dentist, orthodontist, dental practice or dental entity anywhere within 20 miles of each facility, office, or center at which Benham Ortho is then operating or has taken affirmative steps to develop or begin operating at any time during the term of the Employment Agreement.[81]  In this case, based upon the evidentiary record before the Court, the Court finds that the Plaintiffs have failed to satisfy the first and second PI Elements.

First, in considering substantial likelihood of success, while it is clear that Benham, *himself*, has taken actions on and after April 29, 2024, to manage the business affairs of the Benham Debtor and that certain of those actions took place within 20 miles of the Frisco and McKinney Locations of Benham Ortho, no evidence was introduced of Benham having any involvement with a *"Competing Business"* engaged in, or planning to be engaged in, the business of providing any

---

[79] *See* Plaintiffs' Exh. 115.

[80] *See* Prior Opinion, at p.17 & n.44 (detailing length of EA Restricted Period).

[81] *See* Plaintiffs' Exh. 18 (Employment Agreement) § 4.2(a)(ii).

such business-related services to others.  No evidence was introduced, for example, of the *Benham Debtor* serving, or attempting or planning to serve, as a DSO-type entity.

Second, in considering whether there is a substantial threat of irreparable harm, even if the Benham Debtor could be characterized as a "Competing Business," the Benham Debtor is no longer conducting any business within the 20-mile prohibited zone.  Moreover, Benham Ortho is no longer operating and has no plans to restart operations.  Thus, there has not been a sufficient showing of a substantial threat of irreparable harm if Benham is not enjoined from providing business-related services to his own entity, the Benham Debtor.

### Count 5: Tortious Interference with Existing and Prospective Contracts/Relationships

Next, in relation to Count 5 of the Complaint,[82] Plaintiffs assert that they have existing and prospective contracts and business relationships with clients and customers (none of which are specified within the Complaint) that the Targeted Defendants have willfully and intentionally interfered with by taking the actions complained of in paragraph 111 of the Complaint.[83]  In the particular context of the injunctive relief sought, it appears that the Plaintiffs are suggesting that the Targeted Defendants have interfered with the Plaintiffs' existing and prospective DSO-type business services contracts and relationships.  Based upon the evidentiary record before the Court, the Court finds that the Plaintiffs have failed to satisfy the second PI Element.

As a starting point, the Plaintiffs have successfully established that the Targeted Defendants have knowingly, willfully, and intentionally taken actions from and after April 29, 2024, to interfere with Benham SubCo's agreement and business relationship with Benham Ortho under the BSA, Five Point's business relationship with Benham Ortho established pursuant to the BSA Subcontract, and Five Point's contractual rights under the Frisco Location Lease and

---

[82] *See* Prior Opinion, at p.32 & n.78 (detailing the elements of a tortious interference under Texas law).

[83] *See* Complaint ¶ 111.

McKinney Location Lease.  Importantly, in the context of considering the injunctive relief sought, all of the aforementioned contracts and business relationships directly relate to the provision of business-related services to Benham Ortho.

This, then, takes the Court to consideration of whether there is a substantial threat of irreparable harm.  The Court finds that there is not.  Benham Ortho is no longer operating and has no intention of restarting operations.  Thus, there is no longer the possibility of irreparable injury.  Indeed, Five Point (with the consent of Benham SubCo) has, itself, effectively taken steps to move the Benham Ortho practice to Frisco Star.

### Count 6: Tortious Interference with Existing Contract

Finally, in relation to Count 6 of the Complaint,[84] Plaintiffs assert that the Benham Debtor has willfully and intentionally interfered with Benham's contractual obligations to the Five Point Parties under the APA and Employment Agreement.[85]  In essence, the Plaintiffs seek to enjoin the Benham Debtor from engaging in the same type of conduct that the Plaintiffs seek to enjoin Benham from taking predicated upon Counts 3 and 4 of the Complaint.  Hence, for the same reasons the Court declines to impose pretrial injunctive relief against Benham predicated upon Counts 3 and 4, the Court declines to impose pretrial injunctive relief against the Benham Debtor predicated upon Count 6.

### Resulting Ruling

For the foregoing reasons, the Court will deny the PI Application insofar as requesting the injunctive relief set out in paragraph 1 of the Proposed PI.

---

[84] *See again* Prior Opinion, at p.32 & n.78 (detailing the elements of a tortious interference under Texas law).

[85] *See* Complaint ¶ 115.

### 2.    Interference with Benham Ortho Patient Relationships

Plaintiffs next request that the Targeted Defendants be enjoined and prohibited from taking the following action:

> Soliciting, recruiting, inducing, persuading, or encouraging any person who is or was a patient of Benham Ortho, the Practice at the Frisco Location, the Practice at the McKinney Location, or of any of their dentists or orthodontists, to terminate or otherwise interfere with his or her patient relationship (including through the solicitation or encouragement to transfer patient care, patient records, seek refunds from the Five Point Parties or their representatives, or third-party affiliates, instructing or encouraging patients to submit complaints to any regulatory authority concerning their patient care concerning Benham Ortho, Dr. Young, Dr. Lustig, or any other actions to detract from their patient relationship with Benham Ortho), or to receive any orthodontic, aligner or dental services, treatment or consultation from any other person.[86]

The Plaintiffs again predicate such relief on Counts 3, 4, 5 and 6 of the Complaint.  In the case of Count 3 (breach of the APA), the APA provision at issue appears to be APA § 7.2(c)(i).  In the case of Count 4 (breach of the Employment Agreement), the Employment Agreement provision at issue appears to be Employment Agreement § 4.2(c)(i).

Here, it is unnecessary to individually analyze each of the Counts because, regardless of the Count at issue, the Plaintiffs cannot satisfy the second PI Element.  In this regard, the injunctive language sought to be imposed is clearly designed to protect patient relationships with Benham Ortho.  As acknowledged by Lustig, however, Benham Ortho is no longer operating, cannot operate, and has no plans to resume operating.  Thus, because there are no longer any patient relationships with Benham Ortho capable of being preserved or protected, there is no longer any risk of irreparable injury.

For the foregoing reasons, the Court will deny the PI Application insofar as requesting the injunctive relief set out in paragraph 2 of the Proposed PI.

---

[86] See Proposed PI ¶ 2.

### *3.      Practice Name Restriction*

Third, Plaintiffs request that the Targeted Defendants be enjoined and prohibited from taking the following action:

> *Directly or indirectly using, practicing, or operating under "Benham Orthodontics" or any variant thereof, including but not limited to: "Benham Orthodontics & Associates, P.A.," "Benham Family Orthodontics," or "Family Orthodontics by Dr. Adam Benham."*[87]

The Plaintiffs predicate such relief on Count 4 (breach of the Employment Agreement) and Count 6 (tortious interference with the Five Point Parties' contracts with Benham) of the Complaint. In the case of Count 4, the Employment Agreement provision at issue appears to be Employment Agreement § 4.3.[88]

Similar to the prior discussion, it is unnecessary to individually analyze each of these Counts because, regardless of the Count at issue, the Plaintiffs cannot satisfy the second PI Element. The name use restrictions of § 4.3 are clearly designed to protect the Benham Ortho Practice. While it is clear that, since April 29, 2024, Benham has used variants of "Benham Orthodontics" in providing services through the Benham Debtor, and the Benham Debtor, as an entity controlled by Benham, has effectively interfered with Benham's obligations under § 4.3 of the Employment Agreement by operating under a name(s) that uses variants of "Benham Orthodontics," because Benham Ortho is no longer operating and has no plan to resume any operations, there is no longer any risk of irreparable injury to Benham Ortho from the Targeted Defendants' use of any variants of the name "Benham Orthodontics." Indeed, in taking steps to effectively move the Benham Ortho Practice to Frisco Star, Five Point has elected to use the name

---

[87] *See* Proposed PI ¶ 3.

[88] *See* Employment Agreement § 4.3 (providing that Benham shall not, directly or indirectly, use or practice or operate under "Benham Orthodontics" or any variants thereof).

"Frisco Star Orthodontics."    Thus, there is no risk of confused identity because of name similarity.[89]

For the foregoing reasons, the Court will deny the PI Application insofar as requesting the injunctive relief set out in paragraph 3 of the Proposed PI.

### 4.    *Disparagement Restriction*

Fourth, Plaintiffs request that the Targeted Defendants be enjoined and prohibited from taking the following action:

> *Disparaging the Five Point Parties or their respective representatives, agents, or affiliates.*[90]

The Plaintiffs predicate such relief on Counts 3, 4, 5, and 6 of the Complaint.

Before considering the requested relief in the context of such Counts, the Court notes that the Plaintiffs have requested that the Court construe the term "disparage" more broadly than in the Prior Opinion.    In particular, the Plaintiffs take issue with the Court's reliance upon a definition that included a component of falsity.[91]    They argue that the plain meaning of the word includes the making of a statement that is critical, slightful, disrespectful, or sneering in nature, irrespective of whether true or false.[92]

Curiously, in the Complaint, each of the examples of statements claimed to be disparaging include a component of falsity: "*falsely* telling the Five Point Parties and their employees they were evicted, utilizing a temporary restraining order under false pretenses to continue providing

---

[89] This is not to suggest that Benham is now immune from complying with § 4.3 of the Employment Agreement or that the Benham Debtor is free to continue to interfere with Benham's obligations under § 4.3.   To the contrary, any such continuing breach or interference may well subject Benham and the Benham Debtor to damages.   The point is that there is simply no longer the type of risked irreparable injury to Benham Ortho that warrants pretrial injunctive relief.

[90] *See* Proposed PI ¶ 4.

[91] *See* Prior Opinion, at p.34 & n.83.

[92] *See* Docket No. 50 (Plaintiffs' trial brief), at pp. 13-15 (ECF pp.18-20).

orthodontic services to the Five Point Parties' patients;" and "*misrepresenting* to the Five Point

Parties' patients and the public the status of the lawsuit and the Five Point Parties' conduct."[93]

Even so, the Plaintiffs make a valid point.  Under both Delaware law (in regards to the APA) and

Texas law (in regards to the Employment Agreement),[94] the common, plain meaning of the word

"disparage" is to speak of in a slighting, belittling, or disrespectful way (whether truthful or not)

so as to reduce in esteem or rank the target of the statement in the eyes/ears of the reader/listener.[95]

Thus, with this in mind, the requested injunctive relief is now considered.

### *Counts 3 and 4: Breach of the APA and Employment Agreement*

In relation to Count 3 of the Complaint, Plaintiffs tie their request for injunctive relief to §

7.2(e) of the APA which provides that, during the APA Restricted Period, Benham shall not,

directly or indirectly:

> *Disparage or make derogatory statements (orally, in writing, social media, electronically or otherwise) regarding [Five Point], [Benham SubCo], the Practice, [Benham Ortho], their respective Affiliates or the Supported Practices (provided, that this clause is not intended to prevent [Benham] from testifying truthfully and in good faith to the extent required by Law in response to a valid subpoena or other compulsory legal process).*[96]

In relation to Count 4 of the Complaint, Plaintiffs tie their request for injunctive relief to § 4.2(d)

of the Employment Agreement which provides that, during the EA Restricted Period, Benham

shall not, directly or indirectly:

> *[D]isparage or make derogatory statements (orally, in writing, social media, electronically or otherwise) regarding [Benham Ortho], the Practice, its providers or [Benham SubCo] (provided, that this clause is not intended to prevent [Benham]*

---

[93] *See* Complaint ¶ 101 (emphasis added).  The Court notes that the Plaintiffs did not limit the Count to only these two statements.  They simply highlighted these two statements as examples of the type of allegedly disparaging statements being made.

[94] Neither the APA nor the Employment Agreement includes a definition of "disparage."

[95] *See Shannon v. Memorial Drive Presbyterian Church U.S.*, 476 S.W.3d 612, 623 (Tex. App. – Houston [14th Dist.] 2015, pet. denied); *Virtual Bus. Enters., LLC v. Maryland Cas. Co.*, C.A. No. 07C-12-070 MMJ, 2010 WL 1427409, at *6 (Del. Sup. Ct. Apr. 9, 2010), *appeal ref'd*, 994 A.2d 744 (Del. 2010).

[96] *See* APA § 7.2(e).

*from testifying truthfully and in good faith to the extent required by applicable Law
in response to a valid subpoena or other compulsory legal process).*[97]

As evidenced by the above, while the provisions largely overlap in terms, the APA adds protective

coverage for Five Point and the Supported Practices, whereas the Employment Agreement is

limited to Benham Ortho, its Practice, and Benham SubCo.  Based upon the evidentiary record

before the Court, the Court finds that the Plaintiffs have satisfied each of the PI Elements with

respect to Count 3 but not Count 4.

As to Count 3, in first considering the likelihood of success on the merits, the evidentiary

record before the Court establishes that Benham has had a hand in circulating the following

statements to Benham Ortho patients:

Statement #1
"Dear valued patients of the Benham Orthodontics family…. I have fought to see
patients since February when I was locked out of the practice by my partner.  I was
once again locked out of the practice on July 19th and forbid to see patients within
20 miles of Frisco and McKinney due to a noncompete with my partner…. I have
had to let go of many of my wonderful staff that have been with me for years and
its [sic] breaks my heart because we all became a big work family that loved and
supported each other…. Sincerely, Dr. Adam Benham and Team"[98]

Statement #2
"Hello everyone…. It has also come to my attention that a letter has been sent out
to patients from Jeremy Lustig and Andy Young affiliated with Five Points.  I hope
it is becoming apparent to you now that I have been telling the truth about my
situation and I was never on personal leave or medical leave.  I am fighting for my
practice and justice for all of my wonderful patients and my 49% percent [sic]
equity in Benham Orthodontics…. Five Point has … stated they are … changing
the name of the Practice to Frisco Star Orthodontics.  I was ordered to stay away
from the practice until trial is set for June 2025…. I will continue to fight for justice
and fairness for all my patients and staff who have been affected…. Sincerely, Dr.
Benham and Team"[99]

---

[97] *See* Employment Agreement § 4.2(d).

[98] *See* Plaintiffs' TRO Exh. 2N.

[99] *See* Plaintiffs' TRO Exh. 2S.

Both statements are disparaging in nature to Five Point and Lustig and Young, as the Affiliates of (among others) Benham Ortho.[100]  Therefore, the Plaintiffs have established a substantial likelihood of success on the merits with respect to Count 3.

The Court finds that the Plaintiffs have also established a risk of irreparable injury.  By their very nature, statements like those reflected above have the potential to reduce in esteem or rank those protected by APA § 7.2(e) and, thus, correspondingly irreparably injure the direct or indirect relationships that such protected parties have with existing and prior patients of Benham Ortho.  Moreover, as evidenced by Statement #2 above, even after Five Point repositioned the remaining Benham Ortho Practice to Frisco Star, Benham has persisted in his circulation of disparaging comments to current and former Benham Ortho patients.

Turning to the balancing of harm, the Court again finds that the Plaintiffs have satisfied the element. The potential ongoing harm that may result to the protected § 7.2(e) parties in the absence of the issuance of injunctive relief clearly outweighs any harm that may be caused to Benham by the injunction.  It is one thing for Benham to *neutrally* respond to inquiries *initiated by Benham Ortho patients* about why he is no longer practicing at the Frisco and McKinny Locations – conduct that is not precluded by the APA and is not something that is sought to be enjoined – but quite another to *self-initiate* statements to patients that are clearly designed to paint the protected § 7.2(e) parties in a bad light (*e.g.*, by suggesting in the above statements that Five Star, Lustig and Young have taken steps to prevent patients from being able to be treated by Benham, forced Benham to fire Benham Ortho staff, and lied to patients about the reason for Benham's absence from the clinics).  That type of conduct is precluded by the APA and the pretrial preclusion of such conduct presents no real harm to Benham.

---

[100] The APA defines an "Affiliate" as "(i) a person or entity controlling, controlled by or under common control with, another person; and (ii) any person or entity capable of being controlled by another person, with 'control' having the meaning contemplated in Rule 405 under the Securities Act."  *See* APA Exh. A (definitions).

Finally, the Plaintiffs have successfully established that, to the extent of the injunctive relief to be provided (as specified below), the public interest will not be disserved.  Such relief conforms with the agreement made by Benham pursuant to the APA and does not impermissibly or unlawfully muzzle Benham.

Turning to Count 4, which is narrower in scope, neither Statement #1 nor Statement #2 is particularly slighting, belittling, or disrespectful of the parties protected by Employment Agreement § 4.2(d) – namely, Benham Ortho, its providers, and Benham SubCo.  No other evidence was introduced at trial to substantiate any disparaging statements in violation of the Engagement Agreement.  Therefore, the Plaintiffs have failed to establish a substantial likelihood of success on the merits with respect to Count 3.  As such, the request for injunctive relief predicated upon Count 3 will be denied.

### Counts 5 and 6: Tortious Interference

In relation to Counts 5 and 6 of the Complaint, as noted in the Prior Opinion, to establish a claim for tortious interference, a plaintiff must prove, among other things, that the interference complained of both proximately caused the plaintiff injury and that the injury resulted in actual damages or loss.[101]

In relation to both Counts, the Plaintiffs assert in relation to the first of the PI Elements that the Benham Debtor actively participated in the complained of disparaging conduct.  The Court agrees.  The communications to Benham Ortho patients containing Statement #1 and Statement #2 came from email addresses used by the Benham Debtor and encouraged the Benham Ortho patients to reach back out to the Benham Debtor address to schedule an appointment and to obtain patient transfer forms.[102]   Once communications such as Statement #1 and Statement #2 began to be

---

[101] *See* Prior Opinion, at p. 32 & n.78.

[102] *See* Plaintiffs' TRO Exhs. 2N and 2S.

transmitted to patients by the Targeted Defendants, Benham Ortho experienced a dramatic increase in the receipt of patient transfer requests, implicitly indicating that the content of the communications played a material role in causing patients to terminate their business relationships with the Five Point system.  Thus, the Court finds that the Plaintiffs have carried the burden of establishing a substantial likelihood of success on the merits.

Next, in relation to irreparable damage, the Plaintiffs have successfully established that, absent the issuance of injunctive relief, the Targeted Defendants will continue to interfere with Five Point patient relationships.  And turning to the third and fourth PI Elements – the balancing of harm and public interest – for the same reasons that the Plaintiffs have carried their burden of establishing such PI Elements in relation to Count 3, they have also carried their burden in relation to Counts 5 and 6.

### *Resulting Ruling*

For the foregoing reasons, the Court will grant in part, and deny in part, the PI Application insofar as requesting the injunctive relief set out in paragraph 4 of the Proposed PI.  Specifically, the injunction will be limited to the protective language set forth within APA § 7.2(e).[103]

### 5.    *Relief in Relation to Five Point Personal Property*

Fifth, Plaintiffs request that the Targeted Defendants be enjoined and prohibited from taking the following action:

> *Removing, transporting, concealing, altering, distributing, disseminating, manipulating, destroying, or otherwise using any personal property the Five Point Parties owned and/or had the right to possess to the exclusion of the Defendants as*

---

[103] The Court notes that while § 7.2 of the APA provides of the non-disparagement provisions of § 7.2(e) to only apply through January 1, 2025 (the "Restricted Period"), § 7.4 of the APA provides that "[i]f [Benham] breaches any of the provisions contained in … Section 7, the Restricted Period related solely to [Benham] shall be extended by a period of time equal to the period of time during which such Person breaches … Section 7."  *See* APA § 7.4.  Benham has been breaching the non-disparagement provisions of § 7.2(e) since roughly early May 2024 (*i.e.*, roughly 6-7 months).  Therefore, no time limitation will be placed on the injunctive relief because it is likely that this case will be tried by no later than June 2025.

*of July 19, 2024 (the "Five Point Personal Property") originating from or located at the Frisco or McKinney Locations as of or prior to July 19, 2024.*[104]

Additionally, Plaintiffs request that the preliminary injunction require the Targeted Defendants:

*[T]o immediately return to the Five Point Parties ... all Five Point Personal Property ... that the Defendants (or any of them) removed from the Frisco Location or the McKinney Location.*[105]

The Plaintiffs predicate such relief on Counts 3, 4, 5, and 6 of the Complaint.

For reasons stated in the Prior Opinion,[106] the Courts finds that the Plaintiffs have satisfied all of the PI Elements for the issuance of such pretrial injunctive relief on substantially the same terms as set forth within the Adversary TRO.

### 6.    *Retention and Return of Confidential Information*

Finally, Plaintiffs request that the Targeted Defendants be enjoined and prohibited from taking the following action:

*Retaining any originals or copies of all Confidential Information.*[107]

For purposes of such language, Plaintiffs further propose that "Confirmation Information" be defined as:

*Any and all trade secrets and other data and information relating to Benham Ortho's business (including any confidential or proprietary information and intellectual property that Benham Ortho receives from third parties, including Benham Sub[Co] or [Five Point] and its affiliates that is disclosed to or learned by Benham in connection with his employment by Benham Ortho), including, but not limited to, the identity or lists of patients or prospective patients, referral sources, suppliers, vendors, business alliances, plans, strategies, policies, procedures, pricing, fees, software programs, employee information, contracts and financial records, financial status, prescription or treatment information, insurance information, diagnoses and other personal data of patients.*[108]

---

[104] *See* Proposed PI ¶ 5.

[105] *See* Proposed PI, at p.8 (ordered paragraph requiring return of property).

[106] *See* Prior Opinion, at pp.30-32.

[107] *See* Proposed PI ¶ 6.

[108] *See id* n.1.

Additionally, Plaintiffs request that the preliminary injunction require the Targeted Defendants:

> [T]o immediately return to the Five Point Parties all Confidential Information ... that the Defendants (or any of them) removed from the Frisco Location or the McKinney Location.[109]

The Plaintiffs again predicate such relief on Counts 3, 4, 5, and 6 of the Complaint.

In this case, the Court finds that the preclusive aspects of the relief requested is unnecessary because of the pretrial injunctive relief set forth within the Amended Temporary Injunction of the State Court (which remains in full force and effect notwithstanding the removal of the State Court case to this Court). Specifically, pursuant paragraph b of the Amended Temporary Injunction, the Targeted Defendants are enjoined from and prohibited from: "Retaining ... any of Benham Ortho's ... Confidential Information as defined in the Employment Agreement."[110] Importantly, the Employment Agreement's definition of "Confidential Information" is the same as the definition of "Confidential Information" proposed by the Plaintiffs to apply to the requested injunctive language. Therefore, the Court will deny the PI Application insofar as requesting the injunctive relief set out in paragraph 6 of the Proposed PI.

While the preclusive injunctive relief is adequately covered by the Amended Temporary Injunction, the turnover injunctive relief requested by the Plaintiffs is not. Therefore, the Court considers the requested turnover relief in the context of the Counts relied upon.

### Count 3: Breach of the APA

In relation to Count 3 of the Complaint, Plaintiffs appear to tie their request for injunctive relief to § 7.3 of the APA which sets out provisions related to the use, disclosure, and communication of Confidential Information (as defined in the APA).[111]

---

[109] *See* Proposed PI, at p.8 (ordered paragraph requiring return of property).

[110] *See* Amended Temporary Injunction, at p.6 ¶ b.

[111] *See* APA § 7.3.

In considering the likelihood of success on the merits, the Plaintiffs have two problems. First, ostensibly as a result of a scrivener's error, technically § 7.3 does not preclude Benham's retention of any Confidential Information.[112]   Second, § 7.3 does not include any language compelling the return of Confidential Information to the Five Point Parties.  Therefore, to the extent the Plaintiffs' request is predicated upon Count 3, it will be denied.

### Count 4: Breach of Employment Agreement

In relation to Count 4 of the Complaint, Plaintiffs tie their request for injunctive relief to the provisions of § 4.3 of the Employment Agreement.  Among other things, § 4.3 provides: "Upon request of [Benham Ortho], [Benham] shall immediately deliver to [Benham Ortho] the originals and all copies of all Confidential Information and any physical or electronic embodiments thereof, then in [Benham's] custody, control or possession."[113]

With the foregoing in mind, Plaintiffs have successfully established a substantial likelihood of success on the merits.  During the course of the litigation, Benham Ortho has made multiple demands for the return of Confidential Information.  No such information has been returned.  Yet, Meier testified at trial that the Benham Debtor (and, hence, Benham, as its sole owner) has in its possession one or more binders of certain Five Point Proprietary Materials – materials that constitute Confidential Information as defined in the Employment Agreement.

Plaintiffs have also successfully established the other PI Elements in relation to Count 4. First, in relation to irreparable injury, given the fact that Benham is providing services in close proximity to practices within the Five Point system and the Court has not, for reasons stated above, found grounds to preclude Benham from managing the Benham Debtor, Benham's continuing

---

[112] *See id*. ("From and after the Closing Date, Owner shall, directly or indirectly, on … his own behalf or through or in association with any other Person, use, disclose or communicate to any other Person [Confidential Information]….").

[113] *See* Employment Agreement § 4.3.

retention of Confidential Information presents inherent risk to Benham Ortho in relation to its separate confidentiality obligations to Benham SubCo and Five Point with respect to materials that originated from Benham SubCo/Five Point, including Five Point Proprietary Materials. Next, with respect to a balancing of harms, while a clear and present risk of harm exists to Benham Ortho if the injunctive relief is not granted, no risk of harm exists to Benham given that he is already contractually and judicially barred from retaining or using any such Confidential Information. Finally, a granting of the injunctive relief requested will not disserve the public interest, which favors the protection of contractually agreed-upon confidential information.

### *Counts 5 and 6: Tortious Interference*

For similar reasons outlined above, the Plaintiffs have also satisfied the PI Elements in relation to Counts 5 and 6. In relation to Count 5, as explained above, Benham Ortho has certain direct and indirect contractual confidentiality obligations to both Benham SubCo and Five Point.[114] By retaining Confidential Information that the Targeted Defendants know is subject to contractual confidentiality provisions between Benham Ortho and Benham SubCo and, through Benham SubCo, Five Point under the BSA and BSA Subcontract, the Targeted Defendants have knowingly interfered with those contractual obligations. In relation to Count 6, the Benham Debtor has also knowingly interfered with Benham's contractual obligations to Benham Ortho under the Employment Agreement. And for the same reasons outlined above in relation to Count 4 with respect to irreparable injury, the balancing of harms, and public interest, the Plaintiffs have satisfied such PI Elements.

---

[114] *See, e.g.*, BSA § 8.2 (non-disclosure provisions); BSA Subcontract § 6.1 (requiring return of Confidential Information and proprietary property).

### *Resulting Ruling*

For the foregoing reasons, the Court will grant the PI Application insofar as requesting the return of Confidential Information, but limited to terms that are consistent with the provisions of § 4.3 of the Employment Agreement.

### *CONCLUSION*

Based upon the foregoing, the Court will separately issue a preliminary injunction that grants in part, and denies in part, the PI Application and grants preliminary injunctive relief consistent with the terms hereof.

### ###   END OF MEMORANDUM OPINION   ###